[No. 805.]

# DAYTON GOLD AND SILVER MINING COMPANY, PETITIONER, *v.* W. M. SEAWELL, DISTRICT JUDGE, RESPONDENT.

MINING AND MILLING ACT, CONSTITUTIONAL.—The act entitled, "An act to encourage the mining, milling, smelting, or other reduction of ores in the State of Nevada," approved March 1, 1875 (Stat. 1875, 111), is constitutional.

EMINENT DOMAIN—PUBLIC USE.—When the legislative power of appropriation of the private property of a citizen is attempted to be exercised, the true test of its validity is, whether or not the use for which the property is to be appropriated is a "public use," within the meaning of these words as used in section 8, article 1, of the state constitution.

IDEM—DECISION OF LEGISLATURE NOT FINAL.—The declaration by the legislature that the purposes named in the act are "to be for the public use, and the right of eminent domain may be exercised therefor," is not conclusive upon the courts.

IDEM—DOUBTFUL CONSTRUCTION.—Although the action of the legislature is not final, its decision upon this point is to be treated by the courts with the consideration which is due to a co-ordinate department of the state government, and in case of a reasonable doubt as to the meaning of the words the construction given to them by the legislature ought to prevail.

WISDOM, POLICY, AND EXPEDIENCY OF THE LAW.—The legislative and executive departments of the state government are the sole judges of the wisdom, policy, justice or expediency of a law.

IDEM—POWER OF COURTS.—It is only in cases where the federal or state constitution limits the legislative power, and controls the will of the legislature by a paramount law, that courts are authorized to interfere and declare any legislative enactment void.

EMINENT DOMAIN—MEANING OF THE WORDS "PUBLIC USE."—In construing the meaning of the words "public use," as contained in the constitution of this state: *Held*, that any appropriation of private property under the right of eminent domain, for any purpose of great public benefit, interest or advantage to the community, is a taking for a public use.

IDEM—NECESSITY MUST EXIST.—The object for which private property is to be taken must not only be of great public benefit and for the paramount interests of the community, but the necessity must exist for the exercise of the right of eminent domain.

IDEM—WHEN THE POWER CAN BE EXERCISED.—The exercise of the power of eminent domain, even for uses confessedly for the public benefit, can only be resorted to when the benefit which is to result to the public is of paramount importance compared with the individual loss or inconvenience, and then only after an ample and certain provision has been made for a just, full and adequate compensation to the citizen whose property is to be taken.

ORIGINAL application before the Supreme Court for a writ of peremptory mandamus.

The facts are stated in the opinion.

*Whitman & Wood and C. J. Hillyer*, for Petitioner.

I. The proceedings provided by the statute in question are identical with those held to be constitutional for the exercise of eminent domain and taxation in case of railroads in this state. (*Gibson* v. *Mason*, 5 Nev. 282; *Elliot* v. *V & T. R. R. Co.*, Id. 358; *V. & T. R. R. Co.* v. *Henry*, 8 Id. 165.) The method then being correct, the only question is as to the right. It is generally conceded that private property may not be taken by legislative action for private purposes; in fact, we have found but one authority to the contrary (*Harvey* v. *Thomas*, 10 Watts. 64); yet there is no reason for the rule, and we contend that the logical conclusion should be otherwise. And first, the constitution of the United States, so often called to the aid of the rule, has nothing to do with it. The fifth amendment to the federal constitution affects only federal legislation, and does not in any manner control that of the several states. (*Barron* v. *City of Baltimore*, 7 Pet. 273; *Fox* v. *State of Ohio*, 5 How. 449; *Withers* v. *Buckley*, 20 Id. 90.) So then we have only to consider the effect of the state constitution upon the proposition.

It is universally conceded that the constitution of a state, touching the legislative branch, is a limitation, not a grant of power; and that the legislative power is unlimited, save as so circumscribed. (*Gibson* v. *Mason*, 5 Nev. 283; *Leavenworth County* v. *Miller*, 7 Kan. 479.) If this be so, and there is no doubt upon that point, what shall prevent a legislature from taking private property for private use? Is it because it would be a violation of a natural right? Many legislative powers are such, and it is well held that it will not do to make this claim as against a written constitution. (*Butler* v. *Palmer*, 1 Hill, 324; *Bennett* v. *Boggs*, 1 Baldwin, 74; *Cochran* v. *Van Surlay*, 20 Wend. 381; *Calder* v. *Bull*, 3 Dallas, 386; *Gibson* v. *Mason*, 5 Nev. 295.)

No implied prohibition can properly be drawn from the language of the constitution. It is admitted on all hands, that the gist of such language is in the prohibition to take private property for public use without *compensation.* So the only prohibition which can properly be inferred against taking private property for private use, if any may be, is that such property shall not be taken for such use without *compensation.* This we claim, against the great weight of authority to the contrary, is the only logical conclusion. So if the statute in question does take private property for private use, still, as it provides *compensation,* it is not unconstitutional. But it is not necessary for the purposes of this case to assume this extreme ground, though it be clearly correct. The statute declares in terms that the use for which the property is sought to be taken by petitioner is a public use, being that of mining. This should be conclusive (Potter's Dwarris on Statutes, 384, sec. 1); or if not absolutely conclusive, still of such great weight, that unless the use be clearly private, courts will not interfere with the legislative decision. (*United States* v. *Harris,* 1 Sumner, 42; *Beekman* v. *Sar. & Sch. R. R. Co.,* 3 Paige, 45; *Varick* v. *Smith,* 5 Id. 137; *Matter of Townsend,* 39 N. Y. 174; *Bankhead* v. *Brown,* 25 Iowa, 546; *Olmstead* v. *Camp,* 33 Conn. 532; *Todd* v. *Austin,* 34 Id. 78; *Talbot* v. *Hudson,* 16 Gray, 417; *Waterworks Co.* v. *Burkhart et al.,* 41 Ind. 379; Kent's Com., vol. 2, 12th ed., 340, note.)

II. Within the meaning of the law of eminent domain, land is taken for the public use, whenever its taking is for the general public advantage. In addition to the authorities cited in the opinion, counsel refer to the following: (Cooley on Taxation, 77; *Ash* v. *Cummings,* 50 N. H, 591; *Jordan* v. *Woodward,* 40 Maine, 317; *Burgess* v. *Clark,* 13 Ired. 109; *Crenshaw* v. *Slate River Co.,* 6 Rand. 245; *Scudder* v. *Trustees Del. Falls Co.,* 1 Sant. N. J. 694; *Trabue* v. *Macklin,* 4 B. Monroe, 497; *Matter Central Park,* 63 Barb. 282; *Brooklyn Park Commissioners* v. *Armstrong,* 45 N. Y. 234; *County Court* v. *Greenwood,* 58 Mo. 175; *Hildreth* v. *Lowell,* 11 Gray, 345; *Lumbard* v. *Stearns,* 4 Cush. 60; *Burden* v. *Stein,* 27 Ala. 104; *Reddall* v. *Bryan,* 14 Md. 444;

*People* v. *Nearing*, 27 N. Y. 306; *Anderson* v. *Kerns Drainage Co.*, 14 Ind. 199; *Miller* v. *Craig*, 3 Stock. N. J. 175; *Dingley* v. *Boston*, 100 Mass. 544; *Sessions* v. *Crunkilton*, 20 Ohio St. 349; *Edwards* v. *Stonington Cemetery Ass.*, 20 Conn. 466; *Case of Pocopson*, 16 Penn St. 15; *Stevens* v. *Walker*, 15 La. An. 577; *In re Mt. Washington R. R. Co.*, 35 N. H. 134.) All of the purposes allowed in these different cases come properly under the rule quoted, for that they contributed in some degree to the public welfare, pleasure, necessity, or convenience. If these, or any of these, can properly be upheld, how much more the present case, involving the pursuit of mining, which directly affects all the people of Nevada; without which there would be no Nevada.

*De Long & Belknap, Stonehill & Foote, and Thomas H. Wells,* for Respondent.

I. The nature of the use to which the legislature may dedicate the property of a citizen, is not established by the name which they give to it, but is an inherent and inseparble quality or characteristic which cannot be changed however it be denominated. (*Bloodgood* v. *M. & H. R. R. Co.*, 18 Wend 62.) The right of a state government to take private property for private uses is not only contrary to the principles of Magna Charta and the very life of republican institutions, but if the maxim, *"expressio unius," "exclusio alterius,"* is of any force, is contrary to the express provision of the state constitution. "It is prohibited to the government of the state even in its sovereign capacity to take private property except for public uses," consequently it is not in the power of the legislature to authorize private property to be taken for any other purpose. (*Bloodgood* v. *M. & H. R. R. Co.*, 18 Wend. 63.)

II. It is established by principle and authority, that the provision in the constitution of this state, "that private property shall not be taken for public use without just compensation having been first made or secured," prohibits the legislature from taking private property for public uses, without the consent of the owner, even if compensation is made. "In no case can private property be taken, even

where just compensation is paid except for public uses."
(*Gibson* v. *Mason,* 5 Nev. 285; *Taylor* v. *Porter,* 4 Hill, 140;
*Bankhead* v. *Brown,* 25 Iowa, 540; *Tyler* v. *Beacher,* 44 Vt.
648; *Bunn* v. *Bergen,* 2 Selden, 366; *Wilkinson* v. *Leland,* 2
Peters, 627; 2 Kent's Com. 340; Cooley's Const. Lim., 530–2;
Sedgwick's Const. Law, 155.)    It is only on the ground that
the public have the right to the use of railroads, bridges,
wharves, and the like, that private property can be con-
demned for those uses.

III. Statutes similar to the statute under which the peti-
tioner claims the right to take the property of the defend-
ant have been held unconstitutional in the following cases,
viz.: *Gillan* v. *Hutchinson,* 16 Cal. 153; *Reeves* v. *Treasurer
of Wood Co.,* 8 Ohio St. R. 344; *Tyler* v. *Beacher,* 44 Ver-
mont, 648; see also dissenting opinion in *Newcomb* v. *Smith,*
2 Pinney, 140; *Raddell* v. *Bryan,* 14 Md. 144.

By the Court, HAWLEY, C. J.:

The petitioner applies for a writ of mandamus to compel
the respondent, as district judge of the third judicial dis-
trict, to forthwith proceed to hear a certain petition by it
filed and presented under the provisions of the statute of
this state entitled: "An act to encourage the mining, mill-
ing, smelting, or other reduction of ores in the State of
Nevada" (approved March 1, 1875), wherein it is, among
other things, alleged that petitioner desires to acquire a
strip of land in possession of, and claimed by, one James
Waddell; that it is necessary for petitioner to obtain this
land in order to transport the wood, lumber, timbers and
other materials to enable it to conduct and carry on its
business of mining; and petitioner therefore prays that re-
spondent may be compelled to appoint commissions, whose
duty it shall be to determine and assess the compensation
to be paid for such land, and in all respects to proceed and
make such orders as may be necessary, or proper, in pur-
suance of the provisions of said act.    The respondent re-
fused to act in the premises, because, in his judgment, the
act in question is unconstitutional and void.    He claims
that the act is in direct violation of the provision of section

eight, article one, of the constitution, which declares that no person shall be "deprived of life, liberty or property, without due process of law; nor shall private property be taken for public use without just compensation having been first made or secured."

The law, in our judgment, is well settled that, under this provision of the constitution, private property cannot be taken for a private use. The property of a citizen can only be taken by an act of the legislature for a public use, when a necessity exists therefor, and when compensation to the owner has first been made or secured. Whenever, therefore, the legislative power of appropriation of the private property of a citizen is attempted to be exercised, the true test of its validity is, whether or not, the use for which the property is to be appropriated is a "public use," within the meaning of these words as used in the constitution.

The first section of the act in question declares that "the production and reduction of ores are of vital necessity to the people of this state; are pursuits in which all are interested and from which all derive a benefit; so the mining, milling, smelting, or other reduction of ores are hereby declared to be for the public use, and the right of eminent domain may be exercised therefor." (Stat. 1875, 111.)

It is contended by petitioner that this declaration of the legislature is conclusive upon the courts; in other words, that it is not within the legitimate province of the judiciary to control the judgment or decision of the legislature. There are some very respectable opinions which tend to support this view; but the decided weight of the authorities as well as reason is against it. As we construe the provision of the constitution, there is a limit upon the exercise of legislative power which prohibits that body from enacting any law which takes the property of one citizen and gives it to another for a private use, and if the legislature has, in the passage of this act, gone beyond this limitation it is the clear and positive duty of this court to declare the act unconstitutional and void. But in this connection it must, as we think, be admitted that although the action of the legislature is not final, its decision upon this point is to

be treated by the courts with the consideration which is due to a co-ordinate department of the state government, and in case, of a reasonable doubt as to the meaning of the words, the construction given to them by the legislature ought to prevail.

Before we discuss the main questions presented for our decision, it is proper to state that we have nothing to do with the wisdom, policy, justice, or expediency of the law. These are matters of which the legislative and executive departments of the state government are the sole judges; and even if we differed in opinion with them upon any of these grounds, we could not, for such reason, declare the act invalid. In the consideration of this case, these questions will be treated as settled by the passage and approval of the act. The remedy for unwise or oppressive legislation, when within constitutional limits, is by an appeal to the justice, intelligence, patriotism, and protection of the representatives of the people. It is only in cases where the federal, or state, constitution limits the legislative power, and controls the will of the legislature by a paramount law that courts are authorized to interfere and declare any legislative enactment void. These general principles are axiomatic in the jurisprudence of this country.

This brings us to the direct question: What is the meaning of the words "public use" as contained in the provision of our state constitution?" It is contended by respondent that these words should be construed with the utmost rigor against those who try to seize property, and in favor of those whose property is to be seized. In other words, that in favor of private rights the construction should be strict; that the words mean possession, occupation, or direct enjoyment by the public. On the other hand, it is claimed by petitioner that courts should give to the words a broader and more extended meaning, viz., that of utility, advantage or benefit; that any appropriation of private property under the right of eminent domain for any purpose of great public benefit, interest or advantage to the community is a taking for a public use. No question has ever been submitted to the courts upon which there is a greater variety and con-

flict of reasoning and results than that presented as to the meaning of the words "public use" as found in the different state constitutions regulating the right of eminent domain. The reasoning is in many of the cases as unsatisfactory as the results have been uncertain. The beaten path of precedent to which courts, when in doubt, seek refuge, here furnishes no safe guide to lead us through the long lane of uncertainty to the open highway of public justice and of right. The authorities are so diverse and conflicting, that no matter which road the court may take it will be sustained, and opposed, by about an equal number of the decided cases. In this dilemma, the meaning must, in every case, be determined by the common sense of each individual judge who has the power of deciding it. Upon examining the authorities, we find that private property has been taken under a similar provision in the different state constitutions, for the purpose of making public highways, turnpike roads, and canals; of building railroads; of constructing wharves and basins; of establishing ferries; of draining swamps and marshes; of bringing water into cities and towns; of the establishment of water-power for manufacturing purposes; of laying out a public park; of constructing sewers; of erecting levees, to prevent inundation; of building lateral railroads to coal mines; of laying pipe for the transportation of oil from oil-wells to a railroad; of laying gas-pipes; of disposing of stagnant and offensive water, etc., etc.

It has frequently been decided that the public have an interest in the use of a railroad because it increases the facility for travel and transportation from one part of the country to another, and every citizen may use it by paying the usual rates of fare; the owners may also be prosecuted for any damage sustained by their refusal to transport individuals or their property upon the payment of the fare or freight. A turnpike is said to be for a public use because every man can, with his own horses and teams, or on foot, travel upon it for a fixed compensation, and the legislature may, from time to time, limit the amount of toll which the owners may take, and regulate the franchise under which their

right to collect tolls exists. The same principle has been applied to many of the other enumerated cases. It is, however, evident that the act in question cannot be sustained upon any such reasoning. It can only be sustained, if at all, by adopting the theory advanced by petitioner's counsel. The issue is clearly presented and it ought to be fairly met. That the purposes mentioned in the act "are of vital necessity to the people of this state," cannot be denied; that mining is the paramount interest of the state is not questioned; that anything which tends directly to encourage mineral developments and increase the mineral resources of the state is for the benefit of the public and is calculated to advance the general welfare and prosperity of the people of this state, is a self-evident proposition. Hence, it necessarily follows that if the position contended for by petitioner is correct, and I believe it is, then the act is constitutional and should be upheld. Although other and weaker reasons have more frequently been assigned, it seems to me that this is the true interpretation upon which courts have really acted in sustaining the right of eminent domain in favor of railroads and other objects, and in several of the decided cases this reason is expressly given.

Chancellor Walworth, in *Beekman* v. *Saratoga and Schenectady Railroad Co.*, advanced the doctrine that if the public interest could in any way be promoted by the taking of private property, that it must rest in the wisdom of the legislature to determine whether the benefit to the public would be of sufficient importance to render it expedient for them to exercise an interference with the private rights of individuals for that purpose, and said: "It is upon this principle that the legislature of several of the states have authorized the condemnation of the lands of individuals for mill-sites, where from the nature of the country such mill-sites could not be obtained for the accommodation of the inhabitants without overflowing the lands thus condemned. Upon the same principle of public benefit not only the agents of the government, but also individuals and corporate bodies, have been authorized to take private property for the purpose of making public highways, turnpike roads

and canals. * * * In all such cases the object of the legislative grant of power, is the public benefit derived from the contemplated improvement, whether such improvement is to be effected directly by the agents of the government, or through the medium of corporate bodies or of individual enterprise." (3 Paige, 73.) The same views were again expressed by the learned chancellor, and adhered to by a majority of the court in *Bloodgood* v. *The Mohawk and Hudson Railroad Company*, 18 Wend. 13.

In *Gibson* v. *Mason*, Lewis, C. J., after declaring that property could only be taken for public uses, says: "A railroad must, then, whenever the right to take private property is given to it, * * * be held to be a public work, and for the public benefit." (5 Nev. 308.) And in this opinion the language of Chancellor Walworth, in the case of *Beekman* v. *The M. & S. R. R. Co.*, is quoted with approval. But the cases more directly in point, where the decisions are solely based upon this ground, are to be found in the states where a construction is given to what are known as the "mill-dam" or "flowage" acts. It is true that these acts in Massachusetts, owing to some of the provisions of the constitution of that state, could perhaps have been upheld under the existing colonial laws in force in that state, in relation to the rights of proprietors of land traversed by mill streams, at the time of the adoption of the state constitution; but the reasoning of the courts in sustaining the acts is generally, if not universally, based upon the grounds relied upon to sustain the validity of the statute of this state.

In *Boston and Roxbury Mill Corporation* v. *Newman*, wherein the validity of a special act which authorized the taking of private property of certain flat grounds to constitute a receiving basin, so as to enable the corporation to carry on its enterprise, was drawn in question; the court after tracing the history of the mill-dam acts back to their provincial origin, and declaring that there was no difference in principle between the special act and the mill-dam acts under the colonial laws, sustained the validity of the act, and in the course of the opinion say: "The principle is,

that the lands of individuals are holden subject to the requisitions of the public exigencies, a reasonable compensation being paid for the damage. It is not taking the property of one man and giving it to another. At most, it is a forced sale to satisfy the pressing want of the public." (12 Pick. 480.) The principle is better stated by Chief Justice Shaw, who delivered the opinion of the court in *Hazen* v. *Essex Company*. In this case the defendant was incorporated for the purpose of erecting a dam across the Merrimack river, and constructing one or more locks and canals, to remove obstructions in said river by falls and rapids, and to create a water power to be used for mechanical and manufacturing purposes; and it was contended that the act was void because it authorized the taking of property for a private use, and the main question, discussed in the opinion, was whether the use was public or private. The court say: "The establishment of a great mill power for manufacturing purposes, as an object of great public interest, especially since manufacturing has come to be one of the great public industrial pursuits of the commonwealth, seems to have been regarded by the legislature and sanctioned by the jurisprudence of the commonwealth, and, in our judgment, rightly so, in determining what is a public use, justifying the exercise of the right of eminent domain." (12 Cush. 477.)

But still clearer and more direct is the language of Bigelow, C. J., speaking for the court in the subsequent case of *Talbot* v. *Hudson*. "In many cases, there can be no difficulty in determining whether an appropriation of property is for a public or private use. If land is taken for a fort, a canal, or a highway, it would clearly fall within the first-class; if it is transferred from one person to another, or to several persons solely for their peculiar benefit and advantage, it would as clearly come within the second-class. But there are intermediate cases where public and private interests are blended together, in which it becomes more difficult to decide within which of the two classes they may be properly said to fall. There is no fixed rule or standard by which such cases can be tried and determined. Each must

necessarily depend upon its own peculiar circumstances. In the present case, there can be no doubt that every owner of meadow land bordering on these rivers, will be directly benefited, to a greater or less extent, by the reduction of the height of the plaintiff's dam. The act is, therefore, in a certain sense, for a private use, and inures directly to the individual advantage of such owners. But this is by no means a decisive test of its validity. Many enterprises of the highest public utility are productive of great and immediate benefits to individuals. A railroad or canal may largely enhance the value of private property situated at or near its termini; but it is not for that reason any less a public work, for the construction of which private property may well be taken. We are, therefore, to look further into the probable operation and effect of the statute in question, in order to ascertain whether some public interest or benefit may not be likely to accrue from the execution of the power conferred by it upon the defendants. If any such can be found, then we are bound to suppose that the act was passed in order to effect it.   *   *   *   It has never been deemed essential that the entire community, or any considerable portion of it, should directly enjoy or participate in an improvement or enterprise, in order to constitute a public use, within the true meaning of these words as used in the constitution. Such an interpretation would greatly narrow and cripple the authority of the legislature, so as to deprive it of the power of exerting a material and beneficial influence on the welfare and prosperity of the state. In a broad and comprehensive view, such as has been heretofore taken of the construction of this clause of the declaration of rights, everything which tends to enlarge the resources, increase the industrial energies, and promote the productive power of any considerable number of the inhabitants of a section of the state, or which leads to the growth of towns and the creation of new sources for the employment of private capital and labor, indirectly contributes to the general welfare and to the prosperity of the whole community." (16 Gray, 423.)

The principle announced in these cases was approved

and followed by a majority of the court in *Newcomb* v. *Smith* (2 Pin. (Wis.) 131.) It must, however, be admitted, that the value of this case as an authority is materially weakened by a very able dissenting opinion delivered by Larrabee, J., and concurred in by Chief Justice Stow, and the fact that in *Fisher* v. *Horicon Iron and Manufacturing Company* (10 Wis. 351), and other subsequent cases, the supreme court of that state question the correctness of the conclusion reached by the majority of the court in *Newcomb* v. *Smith*, that the "mill-dam" law was constitutional, but adhere to it solely upon the doctrine of *stare decisis*.

In Connecticut the doctrines advanced in the Massachusetts cases are fully supported. Especially is this true of the reasoning of the supreme court in *Olmstead* v. *Camp*, sustaining the validity of the flowage act of that state. It was there contended that the act manifestly authorized the taking of property for private use; that in order to sustain the law it must affirmatively appear that the public have an interest in the thing to be taken; that there must be a public right of control of the thing taken as property in which the state has an interest; that the thing taken is to be used by the public, and is taken that it may be so used. In discussing this question the court say: "One of the most common meanings of the word 'use' as defined by Webster, is 'usefulness, utility, advantage, productive of benefit.' Public use may therefore well mean public usefulness, utility or advantage, or what is productive of general benefit, so that any appropriating of private property by the state under its right of eminent domain for purposes of great advantage to the community, is a taking for public use." (33 Conn. 546.) This decision directly declaring that the "term 'public use' is synonymous with public benefit or advantage" was concurred in by all the judges except Hinman, C. J., who dissented. In the subsequent case of *Todd* v. *Austin*, 34 Conn. 79, the court, notwithstanding the able arguments of learned counsel, who sought by numerous references to decided cases to show that the reasoning of the courts in sustaining the mill acts of Massachusetts did not apply in support of the flowage act of Connecticut,

sustained the decision in *Olmstead* v. *Camp*.   In New Hampshire the same construction is given to a similar provision of the state constitution in the case of *The Great Falls Manufacturing Company* v. *Fernald*.   In this case the petitioners were incorporated, under the authority of the legislature, for the purpose of carrying on the manufacture of cotton and woolen goods, they expended large sums of money in constructing dams and other works, and obtained a water power on Salmon Falls river sufficient for large and successful works.   The defendant claimed title to a small and not valuable piece of land which was flowed by the dam of petitioners; he unreasonably refused to part with the land, and the business of petitioners was in danger of being interrupted and embarassed, if not entirely defeated, by this obstinacy on the part of. defendant.   "The question is," say the court, "whether it is of such public advantage that this obstacle to the successful prosecution of the petitioners' business should be removed on payment of just compensation to the defendants, that the right would be taken for a public use, within the meaning of the term as used in the law on that subject, and in the constitution of this state?   Or, to put the question in a general form, is it of such general public advantage that the streams and waters of this state should be brought into practical use for manufacturing purposes, that a private right standing in the way of an enterprise designed to accomplish extended and connected improvements in the water power of a large stream,   *   *   is taken for a public use when taken to advance such an enterprise and remove an obstacle to its success?"   (47 N. H. 456.)   The question was answered in the affirmative and the act authoring the property to be taken was sustained by a full bench.

The supreme court of New Jersey, in the case of *The Tide-Water Co.* v. *Coster*, held that the right of eminent domain could be employed for the purpose of reclaiming large tracts of tide-water land, and based its decision upon the ground that "it is the resulting general utility which gives such enterprises a kind of public aspect, and invests them with privileges which do not belong to mere private interests."   (18 N. J. 521.)   These views were approved

and followed in the matter of the application for drainage of lands between *Lower Chatham and Little Falls, in the counties of Passaic, Essex and Morris*, 35 N. J. 497. The general principle upon which all of the foregoing cases were decided is sustained by the reasoning of the courts in the following additional cases: *In re Morris Canal and Bank. Co.*, 39 N. Y. 171; *Bloomfield and Rochester Nat. Gas Light Co.* v. *Richardson*, 63 Barb. 437; *Venard* v. *Cross*, 8 Kansas, 248; *Harding* v. *Funk*, 8 Id. 315; *Bankhead* v. *Brown*, 25 Iowa, 540.

The cases of *Hays* v. *Risher* (32 Penn.-Stat. 169), sustaining the constitutionality of the lateral railroad act, and *The West Vir. Trans. Co.* v. *The Volcanic Oil and Coal Co.*, (5 W. Va. 382), sustaining the constitutionality of an act authorizing the plaintiff to construct and maintain a line or lines of tubing for transporting petroleum or other oils through pipes of iron or other materials to any railroad, navigable stream, etc., are not in my judgment distinguishable in principle from the act under consideration; but the reasoning of the courts in support of the validity of said acts is to some extent based upon other grounds.

In Minnesota the supreme court, in *Miller* v. *Troost*, held that the act relating to "dams and mills" went to the extreme limit of legislative power, and after expressing the opinion that if such laws had not been sustained by the courts of other states, they would hesitate long before upholding the act, say: "The decisions, however, are so numerous, and by courts of so great authority, that we are constrained to hold the law to be constitutional." (14 Minn. 369.)

In the light of these authorities, nearly all of which were decided prior to the adoption of our state constitution, I think it would be an unwarranted assumption upon our part to declare that the framers of the constitution did not intend to give to the term "public use" the meaning of public utility, benefit and advantage, as construed in the decisions we have quoted.

The reasons in favor of sustaining the act under consideration are certainly as strong as any that has been given in

support of the mill-dam, or flowage acts, as well as some of the other objects heretofore mentioned.  Mining is the greatest of the industrial pursuits in this state.  All other interests are subservient to it.  Our mountains are almost barren of timber, and our valley lands could never be made profitable for agricultural purposes except for the fact of a home market having been created by the mining developments in different sections of the state.  The mining and milling interests give employment to many men, and the benefits derived from this business are distributed as much, and sometimes more, among the laboring classes than with the owners of the mines and mills.  The mines are fixed by the laws of nature, and are often found in places almost inaccessible.  For the purpose of successfully conducting and carrying on the business of "mining, milling, smelting, or other reduction of ores," it is necessary to erect hoisting works, to build mills, to construct smelting furnaces, to secure ample grounds for dumping waste rock and earth; and a road to and from the mine is always indispensable.  The sites necessary for these purposes are oftentimes confined to certain fixed localities.  Now it so happens, or, at least, is liable to happen, that individuals, by securing a title to the barren lands adjacent to the mines, mills or works, have it within their power, by unreasonably refusing to part with their lands for a just and fair compensation, which capital is always willing to give without litigation, to greatly embarrass if not entirely defeat the business of mining in such localities.  In my opinion, the mineral wealth of this state ought not to be left undeveloped for the want of any quantity of land actually necessary to enable the owner or owners of mines to conduct and carry on the business of mining.  Nature has denied to this state many of the advantages which other states possess; but by way of compensation to her citizens has placed at their doors the richest and most extensive silver deposits ever yet discovered.  The present prosperity of the state is entirely due to the mining developments already made, and the entire people of the state are directly interested in having the future developments

unobstructed by the obstinate action of any individual or individuals.

But it is argued, that in sustaining this act upon the principles we have announced, there is no limitation to the exercise of legislative will in the appropriation of private property. After a thorough investigation of this question, I am of opinion that this argument is more specious than sound. It is an easy task to imagine occasional cases of individual hardship in the practical operation of any law, and this statement is certainly true of all laws passed in the exercise of the power of eminent domain, because it will always be difficult in following any rule to mark out with precision the boundary line beyond which the legislature cannot go. Each case when presented must stand or fall upon its own merits, or want of merits. But the danger of an improper invasion of private rights is not, in my judgment, as great by following the construction we have given to the constitution as by a strict adherence to the principles contended for by respondent. If public occupation and enjoyment of the object for which land is to be condemned furnishes the only and true test for the right of eminent domain, then the legislature would certainly have the constitutional authority to condemn the lands of any private citizen for the purpose of building hotels and theaters. Why not? A hotel is used by the public as much as a railroad. The public have the same right, upon payment of a fixed compensation, to seek rest and refreshment at a public inn as they have to travel upon a railroad.

One purpose is, so far as the legal rights of the citizen are concerned, as public as the other. The same principle is applicable to theaters. All citizens have the undoubted right, upon the payment of the price of admission, to attend all places of public amusement. Stage coaches and city hacks would also be proper objects for the legislature to make provision for, for these vehicles can, at any time, be used by the public upon paying a stipulated compensation. It is certain that this view, if literally carried out to the utmost extent, would lead to very absurd results, if it did not entirely destroy the security of the private rights of

individuals. Now while it may be admitted that hotels, theaters, stage coaches, and city hacks, are a benefit to the public, it does not, by any means, necessarily follow that the right of eminent domain can be exercised in their favor. The truth is, that there is a wide distinction between railroads and hotels, and, also, between the business of mining and that of conducting theaters. A railroad, to be successfully operated, must be constructed upon the most feasible and direct route; it cannot run around the land of every individual who refuses to dispose of his private property upon reasonable terms. In such cases the law interferes, and takes the private property of the citizen upon payment of a just compensation, in order to promote an interest of great public benefit to the community, which could not be successfully carried on without the exercise of this power of eminent domain. The same principle applies to the business of mining; but it cannot reasonably be applied to the building of hotels or theaters. In the building of hotels and theaters the location is not necessarily confined to any particular spot, and it is always within the reach of capital to make the proper selection, and never within the power of any individual, or individuals, however stubborn or unreasonable, to prevent the erection of such buildings. The object for which private property is to be taken must not only be of great public benefit and for the paramount interest of the community, but the necessity must exist for the exercise of the right of eminent domain.

The property of the citizen is sufficiently guarded by the constitution, and he is protected in its enjoyment and use, except in the extreme cases of necessity where it is liable to be taken for the purpose of advancing some great and paramount interest which tends to promote the general welfare and prosperity of the state; and when it is understood that the exercise of this power, even for uses confessedly for the public benefit, can only be resorted to when the benefit which is to result to the public is of paramount importance compared with the individual loss or inconvenience, and then only after an ample and certain provision has been made for a just, full and adequate compensation

to the citizen whose property is thus taken, none of the dangers of future legislation predicted by respondent's counsel, is at all likely to happen. But if in error in this respect, this court, as already stated, is powerless to furnish the remedy. The fact is, as was clearly stated by Justice Beatty, in *Ex parte Spinney* (10 Nev. 333), that the protection which the people of the state enjoy against unjust and absurd legislation, "is not derived from constitutional restrictions, but from the force of public opinion and the character of our representatives. This court has the power to keep the legislature within the terms and plain import of the constitution. To superintend the conscience and intelligence of legislatures, and see that they pay a due regard to considerations of justice and expediency in the enactment of laws, is the business of the people."

We are of opinion that the present law can be enforced by the courts so as to prevent its being used as an instrument of oppression to any one. But if, in its practical operations, it is found to be incompatible with a just preservation of the rights of individuals in private property, it will be the duty of the legislature to repeal the act, and to that tribunal instead of this must the argument of injustice be made. Whether we look at this act in the light of the interpretation which has been given to the term "public use" in the constitution of other states, to our own reasoning and construction of the language of the state constitution, or, to the character of the business and the natural production and resources of this state, we are irresistibly drawn to the conclusion that the act is constitutional and valid.

It is, therefore, ordered that the writ of peremptory mandamus be issued.