DECIDED IN

# THE SUPREME COURT

OF THE

# STATE OF UTAH.

OCTOBER TERM, 1904.

THE HIGHLAND BOY GOLD MINING COMPANY, a Corporation, Respondent, v. JOHN STRICKLEY and ELLEN STRICKLEY, his Wife, Appellants.

No. 1540.  (78 Pac. 296.)

1. **Eminent Domain: Public Uses: Tramways: Mining.**
   The construction and operation of roads and tramways for the development and working of mines is a public use, so that Revised Statutes 1898, section 3588, as amended by Sess. Laws 1901, p. 19, c. 25, authorizing condemnation therefor, is constitutional.[1]

3. **Appeal: Specification of Points Relied on.**
   Questions dicussed in appellant's brief cannot be considered, neither the abstract nor brief containing a specification of the points relied on as grounds for reversal, as required by Supreme Court, Rule 6 (49 Pac. xi).

2. **Legislative Enactments: Constitutionality: Presumption.**
   Legislative enactments are presumed to be constitutional unless the contrary clearly appears.[2]

---

[1] Nash v. Clark, 27 Utah 158, 75 Pac. 371.
[2] State v. Tingey, 24 Utah 225, 67 Pac. 33; State ex rel. v. Lewis, 26 Utah 120, 72 Pac. 388.

(215)

(Decided October 26, 1904.)

Appeal from the Third District Court, Salt Lake County.—*Hon. S. W. Stewart*, Judge.

Action to condemn a right of way ˙ for plaintiff's aerial tramway over defendant's mining claim. From a judgment in favor of the plaintiff, the defendants appealed.

AFFIRMED.

*Frank Hoffman, Esq.*, for appellants.

Kent, in volume 2, page 339, of his Commentaries, says: "The right of eminent domain, or inherent sovereign power, gives to the Legislature the control of private property for public uses and public uses only;" and on page 340, "But if they should take it for a purpose not of a public nature, as, if the Legislature should take the property of A and give it to B, or if they should vacate a grant of property or of a franchise, under the pretext of some public use or service, such cases would be gross abuses of their discretion, and fraudulent attacks on private right, and the law would be clearly unconstitutional and void." The same view is taken by other authors. Smith on Statutes, secs. 136-7; Sedgwick on Statutes, 514; Angell on Highways, secs. 86-7. And it will be found to be sustained by numerous decisions of court and judges of the greatest weight and authority. Wilkinson v. Leland, 2 Peters 653; West River Bridge v. Dix, 6 How. 545; Scudder v. Delaware Falls Co., Saxt. 726; Sinnickson v. Johnson, 2 Harr. 129; Beekman v. Railroad, 3 Paige 73; Varick v. Smith, 5 Paige 159; In re Albany Street, 11 Wend. 149; Bloodgood v. Railroad, 18 Wend. 56; In re John & Cherry

Streets, 19 Wend. 676; Taylor v. Porter, 4 Hill, 140; Harris v. Thompson, 9 Barb. 361; Embury v. Connor, 3 Comst. 511; Hepburn's Case, 3 Bland 98; Bowman v. Middleton, 1 Bay 252; Pittsburg v. Scott, 1 Barr 309; Cooper v. Williams, 4 Ohio 253; McArthur v. Kelly, 5 Ohio 139; Buckingham v. Smith, 10 Ohio 288. In the case of Wilkinson v. Leland, a statute of Rhode Island, which had no written constitution, transferred title to lands. Story, J., says that "the doctrine is utterly inconsistent with the great and fundamental principles of a republican government, and with the right of the citizens to the free enjoyment of their property." "We know of no case in which a legislative act to transfer the property of A to B, without his consent, has ever been held a constitutional exercise of legislative power in any State in the Union."

The case of Warehouse Co., 96 N. Y. 42, heretofore cited, was cited and affirmed in the case of Cole v. La Grange, 113 U. S. Reports, page 6, Book 28, Co-op. Edition, page 896, wherein that court says:

"The general grant of legislative power in the Constitution of a State does not authorize the Legislature, in the exercise either of the right of eminent domain or the right of taxation, to take private property, without the owner's consent, for any but a public object."

The right to impose a tax for a private purpose is universally conceded to rest upon the same proposition as the right to take property for private purposes.

I cite the Savings and Loan Association v. Topeka City, Co-op. Edition U. S. Supreme Court Reports, p. 255. In the syllabus we find:

"1. A statute which authorizes towns to contract debts or other obligations payable in money, implies the duty to levy taxes to pay them, unless some other fund or source of payment is provided.

"2. If there is no power in the Legislature which passes such a statute, to authorize the levy of taxes in aid of the purpose for which the obligation is to be con-

tracted, the statute is void and so are the bonds or other forms of contract based on the statute.

"5. Among these is the limitation of the right of taxation that it can only be used in aid of a public object, an object which is within the purpose for which governments are established.

"6. It cannot, therefore, be exercised in aid of enterprise strictly private, for the benefit of individuals, though in a remote or collateral way the local public may be benefited thereby."

Attention is called to the brief in this case found on pages 458-9, and to the table of cases chronologically arranged by States. The authorities are too numerous to be inserted here, but we think we fairly represent the law upon this subject.

*Messrs. Sutherland, Van Cott & Allison* for respondent.

The respondent at the outset objects to this court hearing this appeal, and insists that this case should be affirmed irrespective of the merits. The appellants assign no errors in their bill of exceptions or in their abstract. The rule is well settled that it is immaterial how many exceptions are taken by an appellant unless errors are assigned thereon. Suppose that a defeated litigant does except to various rulings, it does not follow that when the bill of exceptions is made up that each exception will be relied upon as actual error on an appeal. The appellant in such case can only rely, and should only rely, on those errors which are assigned. Our statute in substance so provides. In session laws of Utah, 1903, page 33, it is provided in substance that when an objection is made to the insufficiency of the evidence to support the verdict or decision that the particulars must be specified in which it is claimed the evidence is insufficient.

The abstract of appellants on page 165 et seq. contains a number of exceptions taken by appellants, but there is nothing to show in the abstract that either of

these alleged exceptions will be relied upon for a reversal. This court has provided in rule 6 : ". . . and shall set forth fully . . . the points relied upon for the reversal of the judgment or decree or order appealed from . . ." Van Pelt v. Park, 18 Utah 146; Bank v. Brown, 20 Utah 86.

The use of the respondent for its aerial tramway is a public use.

The complaint of respondent shows that it is a mining corporation and authorized to acquire, maintain and operate aerial tramways for the transportation of ores and materials. As to whether respondent is doing this ostensibly for itself exclusively or for others, or for both, does not appear from the complaint; therefore, the general demurrer interposed by appellants cannot possibly raise the question whether the use sought by respondent is intended to be for itself or for the public generally, or for both. Therefore, the demurrer was properly overruled irrespective of any other question in the case.

As hereinafter appears, it is a matter of very great importance whether the Legislature can regulate a certain use for the public whenever desired, although in the first instance the use may be so exercised that the company condemning makes the only use. The respondent at the time of the hearing carried its own ores exclusively; it also carried not only its own coal, but coal for the Yampa Mining Company, receiving compensation therefor. So it appears that respondent carries for hire; but at the time of the hearing this was confined only to one person, so that the question before the court is as to whether the use of the respondent is a public use authorizing it to condemn under the statute. To a great extent the discussion of this particular question might be eliminated in view of the recent decision by this court in the case of Nash v. Clark et al.,

27 Utah 158, in which it is held that the construction and use of an irrigation ditch is a public use. This is so analogous and so pertinent to the particular question at bar that it seems unnecessary to go exhaustively over the particular question in this case. Revised Statutes of Utah, 3588, (6), was amended session laws of Utah, 1901, page 19, (6), so that in substance it is provided that the right of eminent domain may be exercised in behalf of the following public uses: (6) ". . . tramways . . . to facilitate the milling smelting, or other reduction of ores, or working of mines; . . ."

A tramway is used for the transportation of ore, coal and all other materials necessary to the development of mines and the mining industry in this State. Appellants seem to contend that because a tramway transports freight through the air instead on the surface of the ground that this makes such a difference that while a railway is a public use a tramway is not. Respondent does not understand that appellants claim that a railway is not a public use, but they simply contend that a tramway is not a public use. However this may be theoretically, it is plain from the above quotation that our legislature has declared a tramway a public use.

Some courts decide that the legislative declaration of what is a public use is conclusive. Stockton, etc., Co. v. City of Stockton, 41 Cal. 168, 169, 175.

There are many other cases to the same effect. We do not cite them, however, on account of our own views being to the effect that the weight of authority, as well as the better reasoning, is to the effect that the legislative declaration is not conclusive on this question. If this court should take the view that the legislative declaration is conclusive, then no further inquiry is necessary as the Legislature has declared that the use for a tramway in the development of mines is a public use. There are courts, however, that do not agree with the above view, but even these courts hold that primarily the question of what is a public use is a legislative ques-

tion rather than a judicial one. In U. S. v. Electric Ry. Co., 160 U. S. 668 it appears that the United States was seeking to condemn certain premises so as to preserve the lines of battle at Gettysburg and the right of eminent domain was authorized for this purpose. It was held in substance that whatever tends to "enhance the respect and love of the citizen for the institutions of his country and to quicken and strengthen his motives to defend them," is a public use. On page 680, it is said:

"  . . .  that when the Legislature has declared the use or purpose to be a public one, its judgment will be respected by the courts, unless the use be palpably without reasonable foundation."

In 169 U. S. 568, Backus v. Fort, etc., Co., it is said:

"The question of necessity is not one of a judicial character, but rather one for determination by the law making branch of the government." (Cases cited omitted.)

See to the same effect: Dayton Mining Co. v. Seawell, 11 Nevada 399-400; 10 Ency. Law (2 Ed.) 1070; Tuttle v. Moore, 64 S. W. 590, and cases cited.

It is obvious that the function to decide upon what is a proper use is rather legislative than judicial because "public use" is practically equivalent to "public benefit," "public policy" and "public good," and these matters are usually left to the Legislature to decide, and courts seldom interfere with the legislative decision on this question. So that, in any event, this court will not hold our statute unconstitutional in this respect unless it is plainly, clearly and palpably so; and in all cases of doubt will declare the constitutionality of the statute. In Fletcher v. Peck, 6 Cranch 128, it is in part said:

"The opposition between the constitution and the law should be such that the judge feels a clear and strong conviction of their incompatibility with each other."

In Munn v. Illinois, 94 U. S. 123, it is said:

"Every statute is presumed to be constitutional.

The courts ought not to declare one to be unconstitutional, unless it is clearly so. If there is doubt, the expressed will of the Legislature should be sustained." Stewart v. Board, 30 Iowa 15.

The effect of this rule is apparent in passing on the constitutionality of statutes. For instance, some statutes might declare that the raising of rats was a public use. This would be plainly, clearly and palpably unconstitutional, because it could not be a public use. On the other hand, it is too clear for argument that a railroad is a public use; all courts so hold, and the reasons are so numerous for so holding that no argument to the contrary could well be made. Between these two extremes, however, courts can approach a dividing line which is so shadowy that it leaves room for argument as to whether or not a statute is constitutional. A short distance on either side of the line the decision is plain, but on the line and for a short distance each side it is doubtful. Whenever the court is in doubt, it holds the statute constitutional. In other words, unless the court is convinced that the statute is plainly, clearly and palpably unconstitutional, it holds the statute constitutional; and so, taking a circle as representing the constitutional and unconstitutional law, there is much more than half of the circle to represent the constitutional law. So if the court investigates the question as to whether the use in question is a public use, aside from what the Legislature has decided, then the first inquiry is as to what is a public use. This changes from time to time as is well illustrated and stated in Stockton etc. Co. v. City of Stockton, 41 Cal. 168. One hundred years ago, a railroad was not a public use, and probably was not known; the same might be said of the telephone, the telegraph, the electric light and many other modern inventions. So what is a public use constantly changes from time to time according to inventions and according to the needs of the public, and especially according to those needs in different localities. It can be easily imagined that a new invention today might not be held a

public use, but that it might develop so rapidly that within six months all courts would unhesitatingly hold that the use was public. So that the question of what is a public use changes from time to time according to our needs and wants. In the same way, public use depends very much on locality and circumstances. There was a time when eminent domain could not be exercised for manufacturing mills and log booms; but in the New England States where water power is very much in demand, and where it is desirable to overflow lands by backing water to get a large flow, the courts hold, and the public demand that these mills should be recognized as a public use and should have the right to exercise the power of eminent domain for the purpose of condemning land for flooding purposes. Manufacturing in New England is of no more importance to that locality than is the development of the mining industry in Utah and in other States similarly situated, nor more of a public use than is irrigation in the arid region. If manufacturing is necessary to the public welfare in New England, it is no more so than are mining and irrigation in Utah. So it is held that it is a public use to establish log booms; it might be held that a log boom was not a public use in Utah, because there is not sufficient timber here to justify such holding. The same ruling might be held in Nevada, and yet exactly the opposite doctrine might prevail in Michigan, Wisconsin, Minnesota, and other States where there are large timber belts. It can well be imagined that mining is a public use in Nevada, Utah, Montana, Colorado, and other western States, and yet that mining would not be a public use in Florida, Louisiana, and other States where there is practically no mineral.

Along the same line of reasoning, a court in Utah would hold that the raising of bananas, oranges and other like products was not a public use, and yet the contrary might reasonably be held in other States adapted to their growth and development. So in New York and Ohio, it would be held that the construction

and operation of irrigation ditches was not a public use, and yet the contrary would reasonably be held, and has been held, in Utah and other arid western States. So as to what is a public use depends very greatly on the locality. The court will see, therefore, that public use does not depend merely upon geography; but as public use is the equivalent of "public benefit," "public policy" and "public purpose," it may be seen that the development of an industry in one State is a public use while in another State the same industry is not. So, because cases may be found in some States in which it is held that the development of mines is not a public use and in another State it is held a public use, are not pertinent to the question unless the public use in the two different States approximates each other as to the public welfare. It is admitted, as stated in the cases hereinafter cited, that the courts are in irreconcilable conflict as to what are public uses, and this principle is recognized in the case recently decided in our own court in the case of Nash v. Clark. For instance this is well illustrated in the "Mills Act," see 1 Lewis Em. Dom., sec. 180 et seq., and instances there given. The United States Supreme Court has never passed upon the constitutionality of these Mill Acts, and has left the matter in doubt. Head v. Mfg. Co., 113 U. S. 20-1.

By the majority of the courts and from the reason of the thing, it is apparent that the backing up of a stream of water and the overflowing thereby of a large area of land for the purpose of operating a mill is not a mere regulation of the water in that stream among the riparian owners. It might be a mere regulation of the water if a statute should provide as to the use of the stream by the different owners and segregate the use; but when a large area of land is overflooded and the land is taken for flooding purposes, then it is not a regulation of water, it is a taking of the land, and the great majority of courts in the United States as well as the standard text-writers so hold. So that this court in deciding this case is forced to go to its own decisions, and

to the most direct State authorities, and to the nearest analogous cases, in order to decide this case, particularly keeping in mind the public policy of other States as compared with our own public policy.

Our own court in Nash v. Clark, 27 Utah 158, 75 Pac. 371, has held that the construction of an irrigation ditch is a public use.

If irrigation in Utah is not a public use, it is very difficult to imagine what could be considered such. It is absolutely necessary to the welfare and development of the State; but irrigation is but slightly, if any, more important to the State of Utah than is the development of the mining industry, and our Legislature has treated these two industries as being on a par, as we will hereafter show.

In Irrigation District v. Bradley, 164 U. S. 112, is a case dealing with the question of public use in regard to irrigation matters in an arid district. In the syllabus on page 113, it is said:

"What is a public use, for which private property may be taken by due process of law, depends upon the particular facts and circumstances connected with the particular subject-matter.

"The irrigation of really arid lands is a public purpose, and the water thus used is put to a public use; and the statutes providing for such irrigation are valid exercises of legislative power."

On page 156 of the same case, it was contended in opposition to irrigation being a public use that the use of the water was not public because it was limited to those particular persons who are entitled to use it at certain specified times, so that the benefit to the public was only indirect or collateral. The same objection could be made by appellants in the case at bar, and the answer to such objection by the Supreme Court of the United States is just as pertinent to this as it was in that case. On page 158, the court further says:

"The question, what constitutes a public use, has

28 Utah—15

been before the courts of many of the States and their decisions have not been harmonious, the inclination of some of these courts being towards a narrower and more limited definition of such use than those of others."

On the same page the court holds that the fifth amendment is only a limitation on the Federal Government, and that if any relief can be granted, it must be under the fourteenth amendment. The court further says on page 159-160:

"It is obvious, however, that what is a public use frequently and largely depends upon the facts and circumstances surrounding the particular subject-matter in regard to which the character of the use is questioned."

The court further says on page 160:

"On the other hand, in a State like California, which confessedly embraces millions of acres of arid lands, an act of the Legislature providing for their irrigation might well be regarded as an act devoting the water to a public use, and therefore as a valid exercise of the legislative power."

The court further says on page 161:

"The fact that the use of the water is limited to the landowner is not therefore a fatal objection to this legislation."

On page 164, the court further says:

"Taking all the facts into consideration, as already touched upon, we have no doubt that the irrigation of really arid lands is a public purpose, and the water thus used is put to a public use."

The above case is quite fully quoted from in the decision by our own court in the case of Nash v. Clark; but we have inserted the above quotations in this brief on account of their particular pertinency.

In Nevada, a statute was passed stating in substance that the development of the mining industry was of paramount importance, and in substance providing for the exercise of the right of eminent domain the

same as in Utah. This statute has been held constitutional in two cases. Dayton Co. v. Seawell, 11 Nev. 394; Overman, etc., Co. v. Corcoran, 15 Nev. 147.

It has been held in Georgia that the development of mines for the purpose of furnishing more gold for circulation is a public use, and that too in a State where not very much gold is found. Hand, etc., Co. v. Parker, 59 Ga. 419.

The Nevada statute has also been held constitutional by the Federal Court. Douglass v. Byrnes, 59 Fed. 29.

The doctrine of the Nevada and Georgia cases has been approved in Montana. Butte, etc., Co. v. Mont., etc., Co., 16 Mont. 526-8, 19 Mont. 462, 48 Pac. 757.

In the last case in 48 Pac. 757, the court states that the particular language not only applies to the use of water for the purpose of irrigation, but also applies to "working a particular mine."

So in Arizona, it has been held that a right of way for an irrigation ditch is a public use. Oury v. Goodwin, 26 Pac. 376.

This case has been approved by our own court in the case of Nash v. Clark.

A great number of authorities as to the development of mines being public use is collated in 10 Ency. Law (2d Ed.), 1086-7.

There are many States in the Union which would undoubtedly hold that an irrigation ditch is not a public use, and they would be entirely correct in so holding but our own court as well as other courts in the arid region would be just as correct in holding on principle to the direct contrary on account of the difference in the public good. The same determination has been held in Maryland in regard to a railway for the carrying of supplies and coal from a mine. 37 Md. 538, 559.

In Chicago etc. Co. v. Morehouse, 87 N. W. (Wis.), 849, 852-3, it was held that a railway company is exer-

cising a public use in condemning land for a spur track to one establishment.

In Morrison v. Thistle Coal Co., 94 N. W. (Iowa) 507, is practically to the same effect as the above case from Wisconsin.

In Ahern v. Dubuque etc. Co., 48 Iowa 140, it was held to be a public use to construct drains and levels for the purpose of draining mineral lands so that they would be available for mining purposes. On principle, there is no difference between the last case and the one at bar.

### STATEMENT OF FACTS.

Plaintiff brought this action to condemn a right of way for its aerial tramway over defendants' mining claim. The record discloses the following facts, viz.: That plaintiff is a mining corporation and authorized to acquire, maintain, and operate aerial tramways for the transportation of ores and other materials. Its mines are situated about two miles from the upper portion of Bingham, and in altitude about 2,700 feet above the valley. The tramway, which consists of two cables supported on wooden towers, extends from the mines to Bingham. The towers in some places are 1,000 feet apart, and in others are close together, the space depending upon the contour of the ground. In case of gullies they are far apart; in going over ridges they are close together. The buckets run on wheels on the cables, and are moved by a single endless cable to which they are attached. Loaded buckets are carried down, and the empty buckets brought up. Each bucket holds about 700 pounds of ore, and in them there is carried over 500 tons of ore per day every day of the year. This has been continued since the spring of 1899. The plaintiff has in sight ore sufficient to last for about seven years, and reasonably expects, in the meantime, to develop ore for four or five years longer. All this ore is to be taken from the mines to Bingham, then

loaded into railroad cars and shipped to plaintiff's smelter in Salt Lake valley. There is also taken over the tramway from Bingham up to the mines about five tons of coal a day; also supplies used in the operation of the mines are taken up in the same way. The placer claim over which the right of way is sought to be condemned is on a hillside, the surface of which is rough and irregular, and four towers are sufficient to cross the claim. A width of twenty-five feet is required for the towers, and for a team to pass over the ground when necessary for the purpose of making repairs thereon. About 200 men are employed at plaintiff's mines, and about 200 at its smelter, which reduces only the ores from plaintiff's mines. A jury was impaneled and assessed the damage caused by the erection and operation of the tramway, and the court entered its findings and decree condemning a right of way for the occupation, maintenance, and use of plaintiff for its tramway. The decree, among other things, provides that "said plaintiff is to move said towers to, or rebuild the same on, at any time, different points on said strip hereby condemned, and as often as requested, and at plaintiff's expense, when reasonably required by the owners of said mining claim for using the part of said claim not sought to be condemned, as well as the part sought to be condemned; and such use of the said part of said surface by said plaintiff is entirely consistent with the use by said defendants of all of said claim, except as aforesaid for the purpose of mining and working the same, and removing the surface again and again; and the said defendants, or the owners of said claim, as the case may be, may work said claim as they see fit and proper, or otherwise use the same, and whenever the rights herein given to said plaintiff interfere with such use, the said plaintiff is subject to remove said towers, as aforesaid, for the purpose of allowing the owners of such claim full use and enjoyment thereof, except as aforesaid." From that part of the judgment which decrees plaintiff a right of way over defendants' mining

claim, defendants have appealed to this court.

McCARTY, J., after stating the facts, delivered the opinion of the court.

Plaintiff bases its right to condemn on section 3588, Rev. St. 1898, as amended in 1901 (Sess. Laws, p. 19, c. 25) which provides that: "The right of eminent domain may be exercised in behalf of the following public uses: . . . (6) Roads, railroads, tramways, tunnels, ditches, flumes, pipes, and dumping places to facilitate the milling, smelting, or other reduction of ores, or the working of mines. . . ." Appellants (defendants below) contend that the foregoing provision of the statute is in conflict with section 22, art. 1, Const. Utah, which provides that "private property shall not be taken or damaged for public use without just compensation," for the reason that the use made of the right of way sought to be condemned is not a public use.

There appears to be an irreconcilable conflict in the authorities as to what constitutes a public use. This, no doubt, is largely due to the fact that in many cases what would be a public use in one jurisdiction would not be in another or different jurisdiction. Thus it has been almost uniformly held throughout the Pacific Coast States that the construction and operation of irrigation ditches is a public use, which doctrine, when applied to the arid region, has been approved by the Supreme Court of the United States, whereas in Ohio, New York, Pennsylvania, and other States where irrigation is not followed and is practically unknown, it would undoubtedly be held not a public use. Therefore what shall be considered a public use often depends somewhat upon the locality, the wants and necessities of the people, the condition with which they are surrounded, and the nature and character of the natural resources of such locality, State, or commonwealth. And while it is for the Legislature to determine, in the first instance, whether the use is a public use, and to provide

the means of condemnation, yet the great weight of authority holds that the declaration of the Legislature is not final, and that it is ultimately for the courts to determine whether a particular use is public or not. 1 Lewis, Eminent Domain (2d Ed.), 158. The text-writers on eminent domain, and the adjudicated cases, practically all agree that, when the Legislature has declared a use to be public, such declaration will be respected and followed by the courts, unless the act is clearly and palpably unconstitutional, or the necessity for the taking is plainly without reasonable foundation. 2 Dillon, Mun. Corp. (4th Ed.), 600; U. S. v. Gettysburg Elec. Ry. Co., 160 U. S. 668, 16 Sup. Ct. 427, 40 L. Ed. 576; Dayton Min. Co. v. Seawell, 11 Nev. 394; Tuttle v. Moore (Ind. T.), 64 S. W. 585; Mills, Eminent Domain (2d Ed.), 10; Lewis, Eminent Domain, 158; 10 Am. & Eng. Ency. Law (2d Ed.), 1070. For a further discussion of the general and well-established rule that legislative enactments are presumed to be constitutional unless the contrary clearly appears, see Fletcher v. Peck, 6 Cranch, 128, 3 L. Ed. 162; Munn v. Illinois, 94 U. S. 113, 24 L. Ed. 77; Stewart v. Board of Supervisors, etc., 30 Iowa 1, 1 Am. Rep. 238; State v. Tingey, 24 Utah 225, 67 Pac. 33, and cases cited; State ex rel. v. Lewis, 26 Utah 120, 72 Pac. 388.

The reason for the rule, when applied to the law of eminent domain, is very apparent, as there are some uses for which private property may be condemned the public character of which is so plain that there is no room for argument; and, on the other hand, there are innumerable uses for which property may be and is used, the private character of which is equally clear and plain. As stated by counsel for respondent, in their brief: "Between these two extremes, however, courts can approach a dividing line which is so shadowy that it leaves room for argument as to whether or not a statute is constitutional. A short distance on either side of the line the decision is plain, but on the line, and for a short distance on each side, it is doubtful." And, as

hereinbefore stated, whenever the court is in doubt, it holds the statute constitutional. Therefore, unless it clearly appears that the use made of the right of way in question is private and in no sense public, the validity of the statute must be upheld. Some general rules by which the question as to what constitutes a public use may be determined were declared by this court in the case of Nash v. Clark, 27 Utah 158, 75 Pac. 371. In that case it was in effect held that when the taking is for a use that will promote the public interest, and which tends to develop the great natural resources of the State, such taking is for a public use.

The mining industry in this State is second in importance only to that of irrigation, and this court held in the case of Nash v. Clark, supra, that the construction and operation of irrigation ditches is a public use. Counsel for appellants, in his brief, concedes "that irrigation is a public use, and that the condemnation of lands for irrigation ditches is for a public use;" and again he says, "There is no person, I take it, of ordinary intelligence, that would assert or think for a moment that the system of irrigation, as adopted and used throughout this whole western country, is not surely a public benefit and a public use." In Great Falls Mfg. Co. v. Fernald, 47 N. H. 444, the court, after speaking of the interests that New Hampshire had in the improvement and development of her natural water power, say: "No State of the Union is more interested than ours in the improvement of natural advantages for the application of water power to manufacturing purposes. Nature has denied to us the fertile soil and genial climate of other lands, but by way of compensation has endowed us with unrivaled opportunities of turning our streams of water to practical account. The present prosperity of the State is largely due to what has already been done towards developing these natural advantages, and there is no assignable limit to our resources in this respect if extended and connected enterprises for the improvement of the

water power in the State should be successfully prose-
cuted hereafter. In no part of the world have the pub-
lic a deeper interest in the success of all undertakings
which promise to assist in the development of these
great natural advantages. Whether we look to the
interpretation which has been given in other jurisdic-
tions to the term 'public use,' in reference to the right
of taking private property for such a use, to the legis-
lative practice under the provincial and State govern-
ments before and at the time when the Constitution was
adopted, to the language of the Constitution itself, to
the early and continued legislative practice under the
Constitution, to the decisions of the courts in this State
or to the character of our business and the natural pro-
ductions and resources of the State, we are drawn to the
conclusion that the Legislature have power to authorize
a private right that stands in the way of an enterprise
set on foot for the improvement of the water power in a
large stream like this river to be taken without the own-
er's consent, if suitable provision is made for his com-
pensation, and that the act of the Legislature is consti-
tutional and valid.''

The same reasons that hold that manufacturing is
necessary to the public welfare in New Hampshire and
other New England States can be urged in behalf of
mining in Utah and other Western States. The min-
ing industry in this State, and in others similarly situ-
ated, not only produces a home market for the products
of the farm, and furnishes thousands of men with steady
employment at liberal and remunerative wages, but also
produces wealth which has enabled other industries to
be created and to flourish, which, without the stimulus
thus furnished, would languish. In Dayton Mining Co.
v. Seawell, supra, Mr. Chief Justice Hawley, speaking
for the court, aptly portrays some of the conditions and
disadvantages under which the mining industry is pros-
ecuted in this inter-mountain region, as well as some
of the benefits derived therefrom, as follows: ''The
mining and milling interests give employment to many

men, and the benefits derived from this business are distributed as much and sometimes more among the laboring classes than with the owners of the mines and mills. The mines are fixed by the laws of nature, and are often found in places almose inaccessible. For the purpose of successfully constructing and carrying on the business of mining, smelting, or other reduction of ores, it is necessary to erect hoisting works, to build mills, to construct smelting furnaces, to secure ample grounds for dumping waste, rock, and earth; and a road to and from the mine is always indispensible. The sites necessary for these purposes are often confined to certain fixed localities.'' We have in this State, in addition to the extensive deposits of gold, silver, lead, and copper ores, large areas of lands containing coal in almost limitless quantities, and we depend almost exclusively upon the coal mines for the fuel used in our manufacturing establishments and for domestic purposes. Now, it is of vital importance to the people that the coal, as well as the other hidden resources of the State, be opened up and developed, and that the mining industry in general, which has been the source of so much wealth to the people of this and other Western States, be conducted on the same extensive scale in the future that has characterized its operations in the past. Therefore the public policy of the State, as exemplified by the act of the Legislature under consideration, is to encourage the people to open up and exploit the mines with which the State abounds, and thereby not only give to the State the wealth which will enable other industries to be created, but furnish thousands of laborers with remunerative employment.

It being conceded, and this court having held, that the construction and operation of irrigating ditches in this State is a public use (Nash v. Clark, supra), it follows that the construction of roads and tramways for the development of the mining industry is a public use, as the same line of reasoning that applies in support of the doctrine in the one case holds good in the other.

Otherwise a party owning a few acres of farming land, or only a few square rods for that matter, could invoke the law of eminent domain, and by condemnation proceedings acquire a right of way across his neighbor's land for an irrigation ditch to convey water to his small holdings; whereas the owners of mines and of works for the reduction of ores, the operations of which furnish thousands of men in this State with employment at good wages, and to which the general prosperity of the State is largely due, would be denied the right to invoke this same rule of law in order to acquire, when necessary to the successful operation of their business, rights of way for the transportation of ores from the mines to the mills and smelters, and for the construction of tunnels for drainage and other purposes. And parties holding the title to ground necessary and suitable for these purposes, which, in many cases, except for such purposes, might be entirely worthless, would be clothed with power to demand and compel payment of an unconscionable price for their lands before parting with the title, or they could refuse, absolutely, to grant the easement required on any terms, and thereby in some cases cripple mining enterprises, or destroy them altogether. Such a policy would not only be inconsistent and unreasonable, but would greatly retard the development of one of the greatest natural resources of the State. We are therefore of the opinion, and so hold, that the construction and operation of roads and tramways for the development and working of mines is a public use. The act of the Legislature under consideration makes ample provision for the payment of a fair price to the owner for lands sought to be condemned, and for all damages that he may suffer because of such taking, and is therefore valid.

There are several other questions of minor importance raised and discussed by appellants in their brief, but as neither the abstract nor brief contain

a specification of the points relied upon as grounds for a reversal, as required by rule 6 of this court (49 Pac. xi), they can not be considered.

The judgment of the trial court is affirmed, with costs.

BARTCH, J., concurs.  BASKIN, C. J., concurs in the affirmance of the judgment.