[No. 979.]

## OVERMAN SILVER MINING COMPANY, RESPONDENT, v. PHILIP CORCORAN ET AL., APPELLANTS.

MINING AND MILLING ACT, FOR CONDEMNATION OF LAND, CONSTITUTIONAL.— The act entitled "an act to encourage the mining milling, smelting, or other reduction of ores in the State of Nevada" (Stat. 1875, 111), is constitutional. (*Dayton G. & S. M. Co.* v. *Seawell*, 11 Nev. 394, affirmed.)

LOCATION OF MINING CLAIM—DISCOVERY OF LODE.—No valid location of a mining claim can be made until a vein, or deposit, of gold, silver, or metaliferous ore, or rock in place, has been discovered.

CONFLICT OF EVIDENCE.—Rule as to conflict and weight of evidence enforced.

CONDEMNATION OF LAND—NECESSITY FOR.—The lands sought to be condemned were the most eligible and convenient for the erection of expensive machinery and sinking a shaft; no other lands could have been selected, except at great expense and at places inaccessible to a railroad or to wagon roads, without which the business of the mining company could not be successfully conducted: *Held*, that a necessity existed for the condemnation of the land in controversy, for the protection and advancement of the mining interests of Storey county.

APPEAL from the District Court of the First Judicial District, Storey County.

The facts are sufficiently stated in the opinion.

*Lewis & Deal*, for Appellants:

I. The act under which the land described in the record was condemned is unconstitutional and void. The petitioner is a mere private corporation, organized to carry on the business of mining for its own benefit, in which the public has no interest, and to permit it to take appellants' property, is to permit private property to be taken for private use. (Green's Brices Ultra Vires (note), 284; 51 Cal. 269; 42 Ga. 500; 5 Nev. 285; 44 Vt. 649; 4 Hin. 140; 66 N. Y. 569; *West Bridge Co.* v. *Dix*, 6 How. (U. S.) 546; 25 Iowa, 540; 2 Seld. 366; 34 Ala. 311; 2 Pet. 627; 18 Cal. 229; 2 Kent's Com. 340; 4 Coldw. 419; 18 Cal. 153; 8 Ohio St. 344; 7 W. Va. 191; Cool. Const. Lim. 530–2; Sedg. Const. Law, 155.)

II. The land sought to be condemned is a part of appellants' mining claims, containing veins of rock in place bearing the precious metals, gold and silver. It was located by appellants and their predecessors in interest, in accordance with the acts of congress, and has been worked so as to hold the same under said act.

As to what is a "vein" or "lode" within the meaning of the mining laws of the United States, see 14 Sawyer, 302; *Mt. Diablo M. & M. Co.* v. *Callison*, U. S. C. C.; 1 Landowner, 18, 114, 180.

III. The legislature did not intend that one mining claim might be taken to enable another claim to be worked. The courts would not permit such an interpretation of the law unless the legislature clearly indicated that such a thing could be done. (43 Conn. 234; 23 Ohio St. 510.)

IV. The term "mining claim," as used in the constitution of the state, and in the act of the legislature, is never embraced or included in the term real estate. (Const., art. IV., secs. 4, 6, 8; Stat. 1866, sec. 2, subd. 11, 101; Stat. 1866, ch. XCVIII.; Stat. 1875, 111; 1 Comp. L., 1019–1022 *et seq.*; Id. 1049, 1317, 1373.)

V. The evidence does not show that a necessity for the condemnation of the property existed. (Stat. 1875, 111;

Stat. 1866, 228, 229; see, also, 6 How. 809; *Le Coul* v. *Police Jury etc.*, 20 La. Ann. 308.

*Stone & Hiles*, for Respondent:

I. The statute under which the land in controversy was appropriated, is constitutional. (*Dayton G. & S. M. Co.* v. *Seawell*, 11 Nev. 394; *Thorn* v. *Sweeney*, 12 Nev. 255.)

II. The testimony elicited at the trial shows that a necessity exists for the appropriation of the land to the possession and use of petitioner. The word "necessity" must not be used in a limited sense. It means the use of the property for the public good or public necessity; a want, an exigency, an expediency for the interest or safety of the state. (*McCulloch* v. *State of Maryland*, 4 Wheat. 413; *Stuyvesant* v. *Mayor*, 7 Cow. 606; *Gilmer* v. *Lime Point*, 18 Cal. 251; *Curtis* v. *Leavitt*, 15 N. Y. 168.)

III. If the lands in controversy were valid locations of mining claims upon the public domain, under the laws of the United States, respondent would still have the right to an appropriation of the land in controversy to its possession and use. Because the testimony shows that a greater necessity exists for the use of the land by respondents for working and developing its mining claim upon the Comstock lode, than appellants have for the use of the land for working and developing any mining claim which they have. The power and right of eminent domain of a state extends over the public lands of the United States within the limits of the state, as well as over the lands of any private proprietor, the government of the United States being, so far as the exercise of such power is concerned, in the same position as any private proprietor, except in cases where the federal government is in the actual occupation of the land and is using it for its own public purposes, as for a fort, or military post, or as the site of a custom-house, a court-house and the like. The public use, within the meaning of the statute, attaches to land only, after the special proceedings mentioned in the statute have been properly and regularly had and done, and that after land has been appropriated by proceedings under the statute to the public uses mentioned

in and defined by the statute, the land may afterwards, by the exercise of the *dominium eminens*, or by like proceedings, upon a proper showing, be appropriated to a like or different public use. In a word, that one public use must yield to another which is more urgent. (*United States* v. *Railroad Bridge Co.*, 6 McLean, 517; Ditch and Canal Law of Congress, 1866; 1 Red. on Railways, 247.)

The question as to when a necessary implication is to be inferred from a statute to exercise the right of eminent domain, depends, in a great measure, upon the nature of the exigencies as they arise, and the circumstances of the particular cases.

In support of the views relied upon by respondent, counsel cite the following additional authorities. (1 Redfield on Railways, sec. 70; *P. P. & J. R. R. Co.* v. *P. & S. R. R. Co.*, 66 Ill. 175; *C. R. I. & P. R. R. Co. et al.* v. *The Town of Lake*, 71 Id. 333; 81 Id. 523; *New York Central & Hudson River R. R. Co.* v. *M. G. L. Co.*, 63 N. Y. 331; *Matter of Rochester Water Commissioners*, 66 Id. 418; *Richmond R. R. Co.* v. *Louisa R. R. Co.*, 13 How. 83; *Inhabitants of Springfield* v. *Conn. R. R. Co.*, 4 Cush. 63; *Boston Water Power Co.* v. *Boston & Worcester R. R. Co.*, 23 Pick. 360.)

*B. C. Whitman and Wm. Woodburn*, also for Respondent.

By the Court, HAWLEY, J.:

Respondent is a mining corporation engaged in the business of mining, milling, and the reduction of ores in Storey county, and instituted this proceeding to have condemned and appropriated to its use certain lands belonging to appellants, under the provisions of the act entitled "an act to encourage the mining, milling, smelting, or other reduction of ores in the State of Nevada" (approved March 1, 1875), so as to enable it "to develop its mine and successfully carry on its said business."

The lands in question have been for several years located and claimed as mining ground.

The court before which this proceeding was tried, in its finding of facts, says: "That at the time of the location

made by said defendants and their predecessors in interest in the said tracts of land, no vein or ledge of gold, silver, or other metalliferous-bearing ores, earth, or rock in place, had been discovered within any one of the said tracts of land, nor within any mining claim or claims of which said tracts of land, or any one of them, is or are claimed by the defendants to be a part of the surface ground, nor has there been since such locations were made, any vein, or ledge of gold, silver, or other metalliferous-bearing ores, earth, or rock in place, discovered or developed within any one of said tracts of land, or within any mining claim or claims of which said tracts of land, or any one of them, are claimed by defendants to be a part of the surface ground. * * * That a necessity exists for the appropriation to the use of the petitioners of the three tracts of land described in the petition herein, for the purposes alleged in its petition, and particularly for the working and developing of its mining claim and quartz ledge, situated upon the Comstock lode in said Gold Hill mining district, and that the said three tracts of land are a part of the public lands or domain of the government of the United States of America."

Appellants seek to set aside the order of the court condemning their lands upon the following grounds, which they claim "are supported both by legal principles and the decided cases," viz:

1. "That the act authorizing the condemnation of property by mining companies for their own purposes is unconstitutional, because not taken for a public use."

2. "That the act in question does not authorize the condemnation of mining claims; that the words 'real estate,' as used in it, does not include mining property."

3. "If mining is a public use, the land in question was, at the time it was sought to be condemned, appropriated to such public use, and could not therefore be condemned by any other company, unless the statute expressly authorized the taking of the property so used."

1. This court, in *Dayton G. & S. M. Co.* v. *Seawell*, 11 Nev. 394, after a very thorough examination of all the decided cases then published, held that the act in question was

constitutional. The only additional authorities now cited by appellants, upon which we are asked to overrule the decision in *Dayton* v. *Seawell*, are *Consolidated Channel Co.* v. *Central Pacific R. R. Co.*, 51 Cal. 269; *Salt Company* v. *Brown*, 7 W. Va. 191; and *Petition of Deansville Cemetery Association*, 66 N. Y. 569. These cases shed no additional light upon the question discussed in *Dayton* v. *Seawell*.

The truth is, as stated by Mr. Justice Cooley, that courts often find that they are somewhat at sea when they undertake to define, in the light of judicial decisions, what constitutes a public use.

"The reason of the case and the settled practice of free governments must be our guides in determining what is or is not to be regarded a public use, and that only can be considered such where the government is supplying its own needs, or is furnishing facilities for its citizens in regard to those matters of public necessity, convenience or welfare, which, on account of their peculiar character and the difficulty, perhaps impossibility, of making provision for them otherwise, it is alike proper, useful and needful for the government to provide." (Cooley's Const. Lim. 532. See, also, Mills on Eminent Domain, from secs. 10 to 20, and authorities there cited.)

This question was discussed at length in *Dayton* v. *Seawell*, and without again attempting to review the authorities, it is enough to say that we are satisfied that the reasoning of this court in that case is sufficient to justify the conclusion there reached that the act in question is constitutional.

2. If the findings of the court as to the non-existence of any vein or ledge of gold, silver, or other metalliferous bearing ores, earth or rock, is sustained by the evidence, then the second and third points (as above stated) relied upon by appellants, need not be considered, for under the laws of congress no valid location of a mining claim can be made until a vein or deposit of gold, silver, or metalliferous ore or rock in place has been discovered. (*Gleeson* v. *Martin White M. Co.*, 13 Nev. 457.)

Are the findings sustained by the evidence?

It is claimed by appellants that the evidence conclusively

shows that "one or more ledges of gold and silver-bearing quartz rock in place were discovered prior to the location of the claims, and have been developed since," and that upon this point "there is no substantial conflict."

This view is sought to be sustained upon the ground that the testimony of the witnesses introduced upon the part of the appellants was given after a careful examination, and is direct, clear, and positive, while the testimony of respondent's witnesses was given without anything more than a superficial examination, and is simply negative in its character.

The record, however, shows that all of respondent's witnesses had been engaged for several years in the business of mining in Storey county, and were familiar with the Comstock lode. They say that assays of gold and silver can often be found in the country rock; that quartz can be found in many places over the hills from Virginia City to Washoe valley; that there are small seams of quartz and some quartz bowlders to be found within the surface boundaries of the land sought to be condemned; but that there is no. quartz vein, or lode, or anything to indicate a vein formation. Perhaps the strongest objection urged against the insufficiency of respondent's testimony is as to the superficial examination of the shaft "A," in the sinking and timbering of which, according to the testimony of one of the witnesses for appellants, some sixteen thousand dollars was expended.

This shaft is fifty feet deep. A witness for appellants testifies that it contains quartz-bearing mineral, having walls on each side of the ledge; that this ledge was, near the surface, about the width of his hand, but after going down about twenty feet "it widened between four and seven feet." The witnesses for respondent did not go down into this shaft, as there were no means then provided for their going down. They examined the dump containing the earth and rock taken out of the shaft. They found porphyry, feldspar, mixture of lime and broken up quartz bowlders, but nothing, in their judgment, to indicate a quartz vein.

Every lawyer at all familiar with the trial of mining cases where the question of existence, or non-existence, of a lode

or vein is raised, understands the difficulty that is often, we might say always, encountered in the attempt to ascertain the facts. Practical miners, experts, and men of science are often examined as witnesses, and they frequently differ as much in their statement of facts as in their conclusions of judgment. It is especially the province of a jury to determine the disputed question of fact thus raised. When suits of this character are tried, it is often the custom to allow the jurors to visit and examine the ground in dispute, the better to enable them to correctly decide all questions where there is any conflict of opinion.

This proceeding was tried before the court without a jury. The judge presiding has had many years of experience in the trial of mining cases where the question presented in this proceeding has doubtless been often raised.

The record shows that he was requested to visit the premises, but does not state whether he complied with the request or not. In either event it is safe to say that he had better opportunities than we have of judging the character of the respective witnesses and the weight that ought to be given to their testimony.

In our opinion there was a substantial conflict in the testimony, and this statement is sufficient to authorize us (under the previous and frequent rulings of this court) to say that the findings of the court are sustained by the evidence.

3. The only remaining ground to be considered is, whether or not any necessity exists for the condemnation of the land for respondent's use.

It was held in *Dayton G. & S. M. Co.* v. *Seawell,* that the object for which private property is to be taken must not only be of great public benefit and for the paramount interests of the community, but the necessity must exist for the exercise of the right of eminent domain.

It is shown by the testimony in this case that the object of respondents is to sink a vertical shaft upon the lands sought to be condemned, for the purpose of striking the Comstock lode in its eastward dip at a point about four thousand feet below the surface of the earth. The lands

are situated about three quarters of a mile east of the present underground works of the respondent. The Comstock lode dips to the east at an angle varying from thirty to thirty-five degrees.

The formation to the west of the lode is syenite, which is so hard as to render the sinking of shafts or the running of tunnels or drifts therein very difficult and expensive.

The respondent in its present workings, at a depth of about one thousand six hundred feet, has reached this hard formation, and every foot in depth which it may sink vertically carries it farther away from the lode which it is endeavoring to work and develop. And this work, if continued, would have to be prosecuted in a syenitic formation which, according to all the testimony, would render successful excavation impossible.

This testimony, in our opinion, sustains the findings of the court that a necessity exists to appropriate this land for the use of respondent. The fact that respondent proposes to abandon its present workings to erect new and expensive hoisting works and sink a new shaft at an enormous expense indicates very clearly that a necessity exists for procuring some land for the purpose mentioned, for, as is well said by respondent's counsel, "It is contrary to the common sense and experience of mankind to say that men will propose to perform such gigantic labor and incur such vast expense when no necessity exists therefor. Men never engage in such enterprises except upon the most mature deliberation, and by being impelled by the necessities of their present situation."

It may, for the sake of the argument, be admitted, as claimed by appellants, that respondent could have gone six hundred feet further west or six hundred feet further east and procured other land upon which to erect the necessary hoisting works and sink a shaft. The record, however, shows that all the adjacent lands are located and claimed as mining locations; hence the same objection could have been urged wherever the location of a site was chosen, and if this fact should be considered of sufficient importance to prevent the condemnation of the lands in question,

then it would follow that no lands could ever be procured by the respondent under the act of the legislature.

This case would then come within the category of cases which, as was said in *Dayton G. and S. M. Co.* v. *Seawell,* were liable to happen, that "individuals, by securing a title to the barren lands adjacent to the mines, mills or works, have it within their power, by unreasonably refusing to part with their lands for a just and fair compensation, which capital is always willing to give without litigation, to greatly embarrass, if not entirely defeat, the business of mining in such localities," and confirms the opinion there advanced, that "the mineral wealth of this state ought not to be left undeveloped for the want of any quantity of land actually necessary to enable the owner or owners of mines to conduct and carry on the business of mining."

The law does not contemplate that an "absolute necessity" should exist for the identical lands sought to be condemned. The selection of any site for the purposes specified must necessarily, to some extent, be arbitrary.

The position contended for by appellants is not sustained by any sound reasoning, and is wholly unsupported by authority.

In the matter of the petition of the N. Y. and H. R. R. Co., the court, in discussing this question, said: "It is claimed that there are other lands in the vicinity, equally well adapted to the use of the applicant as those sought to be acquired by these proceedings, and which, possibly, might be acquired by purchase from the owners. But such objections to these proceedings are untenable. The location of the buildings of the company is within the discretion of the managers, and courts can not supervise it. The legislature has committed to the discretion of the corporation the selection of lands for its uses, and if the necessity of lands for such purposes is shown, and the lands sought are suitable, the courts can not control the exercise of the discretion, or direct which of the several plats of ground shall be taken. If the taking of one plat of ground in preference to another could be shown to work great mischief,

and result in great loss, which could be prevented by taking another, and the proceeding to take one parcel compulsorily, in preference to another equally well adapted to the uses of the company, is from some unworthy or malicious motive, and not in the interests of the public, the court might entertain the question, and in the exercise of a sound discretion withhold its consent to the appropriation. But in this case there are good reasons, resulting from the present occupation of, and the expensive improvements put upon these premises by the appellant, why they should be taken if suitable and proper for the purposes required, the owners not claiming that they will sustain any especial injury peculiar to themselves, which would not be sustained by the owners of adjacent lands, if taken." (46 N. Y. 553. To the same effect, see *Boston and Albany R. R. Co.*, 53 N. Y. 576.)

It appears from the testimony that the lands in controversy were the most eligible and convenient; that no other lands could have been selected, except at great expense, and at places inaccessible to a railroad or to wagon roads, without which the business of respondent could not be successfully conducted.

Upon a review of all the facts, it appears to our satisfaction that the appropriation of these lands to respondent's use will be of great benefit and advantage to the mining industry of Storey county; that it is necessary to condemn such lands for the protection and advancement of said interests, and that the benefits arising therefrom are of paramount importance as compared with the individual loss or inconvenience to appellants.

This brings the case within the provisions of the statute, and shows that a necessity exists for the exercise of the law of eminent domain. (*Dayton G. and S. M. Co.* v. *Seawell, supra; Stuyvesant* v. *The Mayor of New York*, 7 Cow. 606; *Gilmer* v. *Lime Point*, 18 Cal. 250.)

The order and judgment appealed from are affirmed.