### DOUGLASS et al. v. BYRNES et al.

#### (Circuit Court, D. Nevada. December 18, 1893.)

1. EMINENT DOMAIN—MINING—LOCATION OF TUNNEL—DISCRETION OF PETITIONERS

In condemning a right of way for a tunnel to a mining claim under the Nevada statute, a large discretion is necessarily vested in the petitioners in selecting the route of the tunnel, and this discretion will not be reviewed by the court unless they have exceeded the authority of the statute or acted in bad faith.

2. SAME—RIGHT TO CONDEMN

The fact that petitioners actually constructed the tunnel before taking steps to condemn the lands cannot affect their right of condemnation.

3. SAME—TUNNEL THROUGH OTHER CLAIMS.

Statutory authority to condemn "real estate" necessary for carrying on the business of mining (Gen. St. Nev. §§ 256–273) includes power to condemn a right of way for a tunnel through other mining claims, when necessary to the development of a given mine.

Petition by J. M. Douglass and the Goodman Gold & Silver Mining Company to condemn a right of way for a tunnel through certain mining ground in which defendants claim an interest.

F. M. Huffaker and Baker, Wines & Dorsey, for petitioners.
E. L. Campbell and W. E. F. Deal, for defendants.

HAWLEY, District Judge, (orally.) The Goodman Gold & Silver Mining Company, a corporation organized and existing under the

laws of the state of Nevada, is the owner of the patented mining claim and mining ground, situate in the Devil's Gate and China-town mining district, known as the "Goodman Mine." J. M. Douglass is the owner and holder of a controlling interest of the capital stock of said corporation, and now is, and for two years last past has been, engaged in working the Goodman mine for his own bene-fit, in his own individual interest, at his sole expense and outlay, with the knowledge and consent of said corporation. Having such ownership and interest in the Goodman mine, they claim the right, under the provisions of the "act to encourage the mining, milling, smelting or other reduction of ores in the state of Nevada," (Gen. St. Nev. §§ 256–273,) to condemn the right of way for a tunnel $7\frac{1}{2}$ feet wide by $7\frac{1}{2}$ feet high, from the Contact mine, through five in-tervening mining claims and locations, viz. the Atlantic, Annie, Red Jacket, South End, and Clinton, to the Goodman mine, and to ap-propriate so much of each of said intervening mining claims as is and will be necessary for the proper construction and maintenance of said tunnel.

The evidence shows that several years ago a tunnel was run through the Contact mine into the Atlantic ground; that a por-tion of this tunnel, by lapse of time and nonuse, had become out of repair; that petitioner Douglass claims to be the owner of one-half of the Contact mine; that the defendants Byrnes and Mulville claim to be the owners of the tunnel, from its mouth on the Con-tact mine, into the Atlantic mine, and they claim that any interest which Douglass may have in the Contact mine is held in trust for them, and is subject to their rights to work the Atlantic mine through the tunnel; that in February, 1892, petitioner Douglass lo-cated a tunnel right, under the act of congress, commencing at the mouth of the old tunnel on the Contact mine, and running through the intervening mining claims before mentioned to the Goodman mine; that he cleaned out the old tunnel running into the Atlantic ground, and repaired it, and has constructed a tunnel the balance of the way through the other claims to the line of the Goodman mine; that the defendants Byrnes and Mulville, claiming to be the owners of the Atlantic ground and the old tunnel, commenced an action in ejectment to recover the possession of the tunnel; that thereafter this proceeding was instituted in the state district court, by petitioner Douglass, and subsequently removed to this court, and the Goodman Mining Company was, upon motion of de-fendants, made a party petitioner herein; that a feasible, econom-ical, direct, and convenient way of running the tunnel is on the line which Douglass selected; that a tunnel could have been con-structed a few feet higher or lower, or a few feet on either side thereof, so as not to interfere with the old tunnel, without much more inconvenience or expense, but no place could have been se-lected without the necessity of running through the ground of va-rious mining claims before reaching the Goodman mine; that the Atlantic, Red Jacket, and South End are patented mining claims, and the Annie and Clinton are not patented.

Section 1 of the act of the legislature of the state of Nevada reads as follows:

"The production and reduction of ores are of vital necessity to the people of this state; are pursuits in which all are interested, and from which all derive a benefit; so the mining, milling, smelting, or other reduction of ores are hereby declared to be for the public use, and the right of eminent domain may be exercised therefor."

Section 2 provides, among other things, that:

"Any person, company, or corporation engaged in mining, milling, smelting, or other reduction of ores may acquire any real estate, or any right, title, interest, estate, or claim therein or thereto necessary for the purposes of any such business, by means of the special proceedings prescribed in this act."

Section 6 provides that:

"Upon the hearing of the allegations and proofs of the said parties, if the said court or judge shall be satisfied that the said lands, or any part thereof, are necessary or proper for any of the purposes mentioned in said petition, then such court or judge shall appoint three competent and disinterested persons as commissioners."

Other sections of the act provide how the proceedings shall be commenced, what shall be set forth in the petition, who shall be made defendants, how the commissioners shall be selected, the manner in which they shall proceed, etc.

The question whether the defendants Byrnes and Mulville are the owners of the tunnel right of way, from its mouth on the Contact mine into the Atlantic ground, need not be determined at this stage of the proceedings. The act contemplates that the parties having any right, title, or interest in the lands sought to be condemned shall make proof of their interest in the land and of its value before the commissioners. In fact, this court cannot, at the present time, determine any question of title to any of the mining claims, for it may be that other parties who have not appeared and answered the petition will appear and assert some right, title, or interest before the commissioners, if any are appointed. Section 3 of the act provides that:

"The persons in occupation of said tract or tracts of land, and those having any right, title, or interest therein, whether named in the petition or not, shall be defendants thereto, and may appear and show cause against the same, and may appear and be heard before the commissioners herein provided for, and in proceedings subsequent thereto, in the same manner as if they had appeared and answered said petition."

The court at the present time can only be called upon to determine whether "the said lands, or any part thereof, are necessary or proper for any of the purposes mentioned in said petition," as provided in section 6, and whether the act authorizes such lands to be condemned for the purposes set forth in the petition. The constitutionality of the act, and the fact that the business of mining is a "public use" in this state, is settled and determined by the decisions of the supreme court in Mining Co. v. Seawell, 11 Nev. 394, and Mining Co. v. Corcoran, 15 Nev. 147. See, also, Lewis, Em. Dom. § 1184; Mills, Em. Dom. § 20.

The power of the legislature having been fully recognized and sanctioned, the purpose of the act should not be hampered by any

narrow or technical objections. The importance of encouraging the mining industry of this state must be kept in view. This was the object, intent, and purpose of the legislature in passing the act, and its wisdom, policy, and expediency was thereby determined. A reasonable, fair, just, broad, and liberal view should be taken by the court in interpreting its provisions. Defendants claim that the petition should be denied because the evidence shows that there were other places in the vicinity as well adapted as the one selected by Mr. Douglass, where the tunnel could have been run without interfering with the old tunnel on the Contact and Atlantic mining claims. The testimony upon this point is not relevant to the real issues in the case. A large discretion is necessarily invested in petitioners in the selection of the route for the tunnel. It must be presumed that self-interest, if nothing else, will dictate that they would not abuse this power. It is not within the power of the court to absolutely control the exercise of this discretion in selecting the land to be condemned. It will not be reviewed by the court unless it appears that they have exceeded the authority of the statute, and have acted in bad faith. In Mining Co. v. Corcoran, there is a complete answer to the claim made by defendants upon this point. The court in that case, in reply to a similar contention, said:

"It may, for the sake of the argument, be admitted, as claimed by appellants, that respondent could have gone six hundred feet further west or six hundred feet further east, and procured other land upon which to erect the necessary hoisting works and sink a shaft. The record, however, shows that all the adjacent lands are located and claimed as mining locations; hence the same objection could have been urged wherever the location of a site was chosen; and, if this fact should be considered of sufficient importance to prevent the condemnation of the lands in question, then it would follow that no lands could ever be procured by the respondent under the act of the legislature. This case would then come within the category of cases which, as was said in Mining Co. v. Seawell, were liable to happen, that 'individuals, by securing a title to the barren lands adjacent to the mines, mills, or works, have it within their power, by unreasonably refusing to part with their lands for a just and fair compensation, which capital is always willing to give without litigation, to greatly embarrass, if not entirely defeat, the business of mining in such localities;' and confirms the opinion there advanced, that 'the mineral wealth of this state ought not to be left undeveloped for the want of any quantity of land actually necessary to enable the owner or owners of mines to conduct and carry on the business of mining.' The law does not contemplate that an 'absolute necessity' should exist for the identical lands sought to be condemned  The selection of any site for the purposes specified must necessarily, to some extent, be arbitrary. The position contended for by appellants is not sustained by any sound reasoning, and is wholly unsupported by authority."

See, also, Railroad Co. v. Kip, 46 N. Y. 553; Ex parte Boston & A. R. Co., 53 N. Y. 576; New York Cent. & H. R. R. Co. v. Metropolitan Gaslight Co., 63 N. Y. 326; Mills, Em. Dom. § 62; Lewis, Em. Dom. § 395.

The real question is whether the site selected by petitioners can be condemned. It will be conceded, as claimed by defendants, that no person can appropriate any land for his own mere private use and convenience. But the petitioners are not seeking to condemn any lands solely for their own private gain, or, from willful or malicious motives,

to injure or destroy the rights of other parties. The act of Douglass in taking possession of the premises and constructing the tunnel without first obtaining the consent of the owners of the mining claims through which it passes, or taking the necessary steps to condemn the right of way, may to some extent account for, if it does not justify, the criticism of counsel as to his conduct. But "the courts cannot dictate the order in which the petitioner shall proceed to acquire property or rights." Lewis, Em. Dom. § 395. The duty of this court ends by determining whether the course now being pursued can be sustained. It cannot be claimed that the petitioners, by the institution of this proceeding, are attempting to wrongfully obtain possession of any of the mining claims owned by other parties, or to destroy any rights which the owners of such claims may have therein. They only ask the right to condemn an easement—a right of way to construct and maintain a tunnel—through the mining lands owned by other persons or corporations, so as to enable them to properly drain, work, and develop the Goodman mine. The tunnel commences on a level with American Flat ravine, and the land upon which the mining claims are located rises steeply from the mouth of the tunnel. The evidence shows that it is necessary to construct a tunnel through the other mining claims in order to properly drain the water from the Goodman mine. Other attempts to accomplish this purpose by the erection of expensive hoisting works and machinery have proved unavailing for that purpose. The Goodman mine cannot be successfully worked without the aid and advantage which such a tunnel will give. There is as much of a necessity for the running of this tunnel as there was for the construction of the road in Mining Co. v. Seawell, or for the sinking of a shaft in Mining Co. v. Corcoran; and in the light of those authorities, and of the principles therein discussed and announced, it seems clear to my mind that this case comes strictly within the provisions of the statute authorizing condemnation to be made. A tunnel properly constructed through a mining claim cannot, as a general rule, be said to seriously interfere with the rights of the owner. Ordinarily, the running of such a tunnel would prove to be of great advantage and benefit to the several mining claims through which it passes; and especially would this be so if proper provision could be made for the owners of such claims to have the use and occupancy thereof, in common with others, for the purpose of working their respective mines. But in any event it is difficult to see what particular objection can be urged to the running of the tunnel, if proper damages are assessed for the injury that may be caused to the mining claims through which it passes. As was said by the court in Mining Co. v. Seawell:

"The property of the citizen is sufficiently guarded by the constitution, and he is protected in its enjoyment and use, except in the extreme cases of necessity, where it is liable to be taken for the purpose of advancing some great and paramount interest, which tends to promote the general welfare and prosperity of the state; and when it is understood that the exercise of this power, even for uses confessedly for the public benefit, can only be resorted to when the benefit which is to result to the public is of paramount importance compared with the individual loss or inconvenience, and then only

after an ample and certain provision has been made for a just, full, and adequate compensation to the citizen whose property is thus taken, none of the dangers of future legislation predicted by respondent's counsel is at all likely to happen."

But it is vigorously contended that the act does not authorize the condemnation of mining claims or mining ground, and that, if mining is a public use, the land in question was, at the time this proceeding was instituted, appropriated to such public use, and cannot be condemned by any other mining company, corporation, or individual. The argument upon these points extended over a wider range than it is necessary for the court to travel in deciding this case. The term "real estate," as used in the statute, was evidently intended to apply to all lands, whether agricultural, timber, or mineral. The language of section 2 of the act, heretofore quoted, is broad and comprehensive enough to include any interest in any lands. The question whether the general terms of this statute will authorize the taking of property that has already been dedicated to a public use depends upon 'the circumstances, conditions, surroundings, and necessities established by the facts of each particular case. The land in question has never been dedicated to the public use, except in the sense that the business of mining is of "public utility, benefit, and advantage" to the people of this state, as declared in Mining Co. v. Seawell. Upon the facts of this case, and under the provisions of the statute, it may safely be said that an easement may be acquired in invitum in lands held and occupied for a public use, when such easement may be enjoyed without detriment to the public or serious interference with the use to which the lands are devoted. Mills, Em. Dom. §§ 44, 45, 47; Lewis, Em. Dom. § 276; In re Rochester Water Com'rs, 66 N. Y. 413; New York Cent. & H. R. R. Co. v. Metropolitan Gaslight Co., supra; Morris & E. R. Co. v. Central R. Co., 31 N. J. Law, 213; Peoria P. & J. R. Co. v. Peoria & S. R. Co., 66 Ill. 174; In re New York L. & W. Ry. Co., 99 N. Y. 13, 1 N. E. 27.

This case does not come within any of the exceptions to this rule. In Mills on Eminent Domain it is said:

"Land already devoted to another public use cannot be taken, under general laws, where the effect would be to extinguish a franchise. If, however, the taking would not materially injure the prior holder, the condemnation may be sustained; or if the property sought to be condemned was not in use, or absolutely necessary to the enjoyment of the franchise." Section 47.

The general principles upon this subject are summed up in Lewis on Eminent Domain, (section 276) as follows:

"Fourth. Whether the power exists in any given case is a question of legislative intent, to be ascertained, in the first place, from the terms of the statute, and, in the second place, by the application of the statute to the subject-matter. If the language of the statute is explicit, as where a particular turnpike is authorized to be taken and laid out as an ordinary highway, the courts have nothing to do but to give effect to the express language of the statute; but, if the language of the statute is not explicit, then it is a question of reasonable intendment, in view of all the circumstances of the case. Authority to construct a railroad through a narrow gorge already occupied by a public way would authorize the use of the old way if the new road could not reasonably be built without it. The chief difficulty arises when authority to condemn property for any purpose is given in general

terms, as is usually the case in these latter years. In such case, the presumption is against the right to take property which is already devoted to public use. This presumption may be overcome by showing a reasonable necessity for the property desired, as compared with its necessity and importance to the use to which it is already devoted."

After a careful examination of the evidence it appears, to my satisfaction, that the appropriation of the right of way for the tunnel through the mining claims of defendants to the Goodman mine will be of great benefit and advantage to the mining industry of Lyon county, where the claims are situated; that it is necessary to condemn the lands asked for in the petition for the protection and advancement of said interests; and that the benefits arising therefrom are of paramount importance, as compared with the individual loss, damage, or inconvenience to the defendants. This conclusion brings the case within the provisions of the statute, and shows that a necessity exists for the exercise of the law of eminent domain. Mining Co. v. Seawell, supra; Mining Co. v. Corcoran, supra. In due time, after notice to parties, an order will be made appointing commissioners to ascertain and assess the damages.