**FREEMAN GULCH MINING CO. et al. v. KENNECOTT COPPER CORPORATION.**

**No. 2216.**

Circuit Court of Appeals, Tenth Circuit.
March 19, 1941.

Rehearing Denied April 22, 1941.

Shirley P. Jones, of Salt Lake City, Utah (H. A. Rich and D. N. Straup, both of Salt Lake City, Utah, on the brief), for appellants.

C. C. Parsons, of Salt Lake City, Utah (Wm. M. McCrea, of Salt Lake City, Utah, on the brief), for appellee.

Before PHILLIPS, MURRAH, and WILLIAMS, Circuit Judges.

PHILLIPS, Circuit Judge.

The Kennecott Copper Corporation[1] is the owner and operator of a large scale open pit copper mining operation in Bingham Canyon, Salt Lake County, Utah, commonly known as the Utah Copper mine. It is one of the largest open pit mines in the world. Its employees number approximately 4,000 and its monthly payroll is approximately $600,000. In the year 1939, it removed 19 million tons of ore. The ore is low grade and large scale operations are essential to the profitable mining thereof. To secure access to the commercial copper ore, a large amount of superimposed material called overburden must first be removed. The mine is terraced with benches or levels. It is bisected by the main Bingham Canyon. The levels on the right side of the mine going up the Canyon, or the westerly side thereof, vary in elevation from 50 to 85 feet and in width from 65 to 300 feet. The overburden, after being drilled and shot, is loaded into cars with electric shovels. Standard railroad lines 95 miles in length extend along the levels and to the concentrating mills and nearby gulches. 55 trains transport the ore to the mills and the overburden to nearby gulches for waste disposal. To preserve the slopes at a safe angle of repose and make the ore available for mining, it is necessary to remove approximately a ton and a quarter of overburden for each ton of ore mined. Among the dump tracks is one known as G dump line. It serves to carry away overburden removed from two levels, known as F prime and G prime levels. Freeman Gulch, which opens into Bingham Canyon at a point below the mine, is the nearest available gulch into which overburden from F prime and G prime levels may be dumped. Kennecott has dumped from the G dump line into Freeman Gulch all of the overburden which land in the gulch owned by Kennecott will accommodate. There is no unused room in other gulches between the mine and Freeman Gulch into which overburden carried out by G line may be dumped. From F prime and G prime levels there must still be removed 20 million cubic yards of overburden, all of which must go out on the G dump line and be deposited in Freeman Gulch and other gulches lying beyond it. Ore output from below F prime

---

[1] Hereinafter referred to as Kennecott.

and G prime levels is conditioned on the removal of overburden therefrom. Of the 11 shovels operating in ore, 7 are working below G prime level. In the year 1939, 70 per cent of the ore mined was from below G prime level. Unless Kennecott can continue to remove overburden from F prime and G prime levels, its production must be sharply curtailed. During the first quarter of 1940, it removed only one ton of overburden to one ton of ore mined. To preserve the slopes of the levels at a safe angle of repose, it must soon sharply increase its stripping ratio.

The Freeman Gulch Mining Company[2] is the owner of a four-fifths interest in a group of patented mining claims covering an area of 197 acres shown on the following map:

A, B, C, and D, comprising 37 acres of land, for the dumpage and storage thereon of overburden, waste, rock, ores, and other materials, for the removal therefrom at any time of such deposited materials, and for railroad rights of way to, from, and across such property for the transportation of such materials.

Freeman has driven three prospecting tunnels, known as Crane, No. 6, and No. 8, on April Fool Fraction, April Fool, and April Fool No. 1. The principal portion of Crane Tunnel is located on tract D, southwest of tract C. Its portal is on the southerly slope of the gulch at an elevation of 6502 feet.

Tunnel No. 8 is located in the southwesterly portion of April Fool No. 1, westerly of the Crane Tunnel, and the prin-

Kennecott owns the remaining one-fifth interest and that portion of the Freeman Gulch lying outside and southerly of the boundary lines of the mining claims.

Kennecott brought this action against Freeman to condemn the surface of tracts

cipal portion thereof is on tract D. Its portal is in the southwesterly portion of April Fool No. 1.

Tunnel No. 6 is located on tracts A and D. Its portal is on tract A on the northerly slope of the gulch at an elevation 139 feet

[2] Hereinafter referred to as Freeman.

below the portal of Crane Tunnel, only 5 or 6 feet above the bed of the stream that flows through the gulch, and near the boundary line of Kennecott land which joins tract A on the south.

Prior to October 14, 1937, Kennecott had dumped a great quantity of waste material over and across the gulch on its own property which is contiguous to tracts A, B, C, and D, and down the gulch therefrom. The easterly slope of Kennecott's dump on such adjacent property rises from the toe thereof a distance of 115 feet to a vertical elevation 76 feet above the bottom of the gulch, and about 70 feet above the portal of Tunnel No. 6. Freeman's present ingress to and egress from the portal of Tunnel No. 6 is over the dump. Freeman cannot dump materials removed from Tunnel No. 6 in the bottom of the gulch because so to do would dam up the gulch and in periods of high water, flood the tunnel. It is, therefore, necesssary for it to carry the materials removed from Tunnel No. 6 along the northerly slope of the gulch and dump them on tracts A and B. Condemnation of tracts A, B, and C would cover up the present portal to Tunnel No. 6 and leave no space on tracts A and B for the dumping of materials removed therefrom.

The uses for which Kennecott seeks condemnation of tracts A, B, and C will not in any wise interfere with the operation by Freeman of Crane Tunnel and Tunnel No. 8.

Freeman is now securing water from Tunnel No. 11 on tract C. Condemnation of tracts A, B, and C will deprive it of this source of water supply, but other sources of water supply are available from Tunnel 10 on tract D and elsewhere on the property.

The group of mining claims was surveyed for patent in September, 1907. The total length of workings therein was then 1263.9 feet. On May 11, 1940, the total length of workings was 2838.1 feet. The mining claims contain no known deposit of ore of sufficient value and quantity to permit of it being mined at a profit. The total length of Tunnel No. 6 is approximately 1000 feet and it is wholly barren of ore. Crane Tunnel is wholly barren of mineralization, except at a point approximately 150 feet from its portal. Tunnel No. 8 has disclosed a fissure and some indication of mineralization. Freeman desires to drive Crane Tunnel to its property line, a distance of approximately 295 feet, from the present face of Crane Tunnel. It also desires to extend Tunnel No. 6 to encounter on its dip the fissure disclosed in Tunnel No. 8.

On October 14, 1937, Kennecott instituted a prior suit against Freeman to condemn tracts A, B, C, and D. The trial court found that while prospecting on the property had developed no mineral in commercial quantities, the mineralized fissure in Crane Tunnel and Tunnel No. 8 justified further exploration and development and that Kennecott's need for the property, while existent, was not immediate. It concluded that Freeman should not be then interfered with in the prospecting of its property, but that it should carry forward its prospecting with due diligence. It dismissed the action without prejudice to a subsequent action for the condemnation of the property, when the necessity should become immediate.

In the course of the trial of the former action, Freeman stressed mineralization in the fissure disclosed in Tunnel No. 8 and its engineer advised the driving of a tunnel to intersect that fissure at an elevation 100 feet below Tunnel No. 8 and the drifting along that fissure as disclosed in the Crane Tunnel to determine whether mineral in paying quantities was present. Freeman also insisted on further prospecting of the property by continuing Tunnel No. 6 to intersect at a greater depth than the Crane Tunnel the fissure disclosed in Tunnel No. 8. Between the time of the trial of the first case on February 24, 1938, and May 11, 1940, three days before the trial of the instant action, Freeman had driven the Crane Tunnel along a continuation of the fissure disclosed in Tunnel No. 8, 545.7 feet, and found the fissure barren of ore. During the same period, Freeman extended Tunnel No. 6, 393.5 feet and discovered no ore.

The property sought to be condemned is not presently a mining property and the prospects of discovering minerals therein in paying quantities must be regarded as exceedingly doubtful.

Kennecott prosecuted the action on the theory that should the trial court conclude Freeman was actually devoting its property to a public use, it would so modify or condition the taking or the use or occupation by Kennecott, that the two uses might stand together, without material impairment or impediment of one by the other. At the trial, Kennecott offered, as a condition to its right to condemn, to drive, at

its own expense, a tunnel extending from a point on its own property southeasterly from April Fool Fraction 5770, through April Fool Fraction and April Fool, to a point near the center of April Fool No. 1, and intersecting the fissure in Crane Tunnel and Tunnel No. 8, and at the portal of such tunnel to provide Freeman, without charge, ample space for dumping waste material, and for mine buildings and shops, transportation, and drainage. The court found that Freeman's property was not presently worthy of development or operation as a commercial mine and that Freeman was only entitled to adequate means for the practical and economic prospecting and exploration of its property; and that all of Freeman's purposes through Tunnel No. 6 might be fully and adequately served and accommodated by the construction of a vertical shaft from a point about 40 feet back from the face of Tunnel No. 6. Whereupon, Kennecott offered, at its own expense, to construct such shaft, equip the same with an electric hoist and a manway and defray the expense of electric current consumed by Freeman in operating the hoist until damages should be assessed upon the permanent taking, and to construct two new trails for Freeman at specified locations.

The court found that such a shaft would afford Freeman means of prospecting, working, and mining its property in all respects superior to Tunnel No. 6 in its present state, with the lack of dump room at its portal.

The trial court entered its judgment wherein it adjudged that Kennecott was entitled to condemn tracts A, B, and C, and to take immediate occupation thereof for the uses and purposes for which they were sought to be condemned, but imposed as a condition that Kennecott construct the shaft from a designated point on the surface to Tunnel No. 6, equip the shaft with an electric hoist, construct a line to supply the hoist with electric energy and until the final determination of the action and the permanent assessment of damages, to defray the cost of electric energy for the operation of the hoist, and to construct two trails at designated locations giving Freeman access over Kennecott's property in the gulch to Crane Tunnel and the shaft, the trails to be equal or superior to the trails presently being used by Freeman. The trial court dismissed the proceeding as to tract D, without prejudice to the right of Kennecott to reinstate the action for the condemnation thereof upon any changed facts, circumstances, or conditions.

Freeman has appealed.

The applicable portions of the Utah statutes granting the right of eminent domain are set out in Note 3.

■ A statute granting the right of eminent domain for a particular purpose

---

3 Sec. 104-61-1, Rev.Stat. of Utah, 1933, in part reads as follows:

"Subject to the provisions of this chapter, the right of eminent domain may be exercised in behalf of the following public uses: * * *

"Roads, railroads, tramways, tunnels, ditches, flumes, pipes and dumping places to facilitate the milling, smelting or other reduction of ores, or the working of mines, * * * or mineral deposits; outlets, natural or otherwise, for the deposit or conduct of tailings, refuse * * * from mines * * * or mineral deposits; * * * also any occupancy in common by the owners or possessors of different mines, * * * mineral deposits, * * * for the flow, deposit or conduct of tailings or refuse matter. * * *"

Sec. 104-61-2, Id., in part reads as follows:

"The following is a classification of the estates and rights in lands subject to be taken for public use:

"(1) A fee simple, when taken for * * * a place for the deposit, of debris or tailings of a mine, * * * provided, that where surface ground is underlaid with minerals, coal or other deposits sufficiently valuable to justify extraction, only a perpetual easement may be taken over the surface ground over such deposits. * * *"

Sec. 104-61-3, Id., in part reads as follows:

"The private property which may be taken under this chapter includes: * * *

"(3) Property appropriated to public use; provided, that such property shall not be taken unless for a more necessary public use than that to which it has been already appropriated. * * *

"(5) All rights of way for any and all purposes mentioned in section 104-61-1, and any and all structures and improvements thereon, and the lands held or used in connection therewith, * * * shall also be subject to a limited use in common with the owners thereof, when necessary; but such uses of crossings, intersections and connections shall be made in the manner most compatible with the greatest public benefit and the least private injury. * * *"

must be liberally construed in furtherance of such purpose. Monetaire Mining Co. v. Columbus Rexall Consol. Mining Co., 53 Utah 413, 174 P. 172, 175.

 While we think the facts demonstrate beyond question that the use for which Kennecott seeks condemnation is a more necessary public use than the use to which the property is being devoted by Freeman, the question of greater necessity is not involved where the condemner seeks the right to use the property in common with the present owner thereof. Monetaire Mining Co. v. Columbus Rexall Consol. Mining Company, supra, 174 P. 176.

We shall assume, but not decide, that the property here sought to be condemned is now devoted to a public use. It is well settled that property devoted to one public use may, under general statutory authority, be taken for another public use, where the taking will not materially impair or interfere with, or is not inconsistent with the use already existing.[4] Such a taking is expressly authorized by § 104-61-3(5). (See Note 3, ante.)

The Utah statute grants the right of eminent domain for the purpose of developing the mining industry and the mineral resources of the state. In Monetaire Mining Co. v. Columbus Rexall Consol. Mining Company, supra, condemnation was granted for the joint use of a mining tunnel by the condemner and the owner thereof, the court saying, "where two public uses can stand together without material impairment or impediment of one by the other, they must so stand. * * * Both uses may well stand together, with some interference of the latter with the earlier, which may be compensated for by damages."[5]

Here, the two uses may stand together. The taking by Kennecott will not materially impair or interfere with Freeman's use. Such taking will promote the public welfare. The continued mining of the Kennecott property will be of great benefit to the state of Utah and its citizens, and in this period of national emergency the continued production of copper from the mine is of primary importance. The shaft will adequately serve in place of the portal to Tunnel No. 6. The new trails will adequately serve the purpose of the old trails and for such inconvenience as Freeman may suffer, it may be adequately compensated for in damages.

We think the trial court properly granted the right of condemnation and immediate occupancy on the conditions imposed and its judgment is accordingly affirmed.

---

[4] Monetaire Mining Co. v. Columbus Rexall Consol. Mining Co., 53 Utah 413, 174 P. 172, 177; Postal Tel. Cable Co. v. Oregon S. L. R. Co., 23 Utah 474, 65 P. 735, 739, 90 Am.St.Rep. 705; Steele v. Empson, 142 Ind. 397, 41 N.E. 822, 825; Western Union Tel. Co. v. Nashville, C. & St. L. Ry. Co., 133 Tenn. 691, 182 S.W. 254, 260; Clarke v. Boysen, 10 Cir., 39 F.2d 800, 816, certiorari denied, 282 U.S. 869, 51 S.Ct. 75, 75 L.Ed. 768; Douglass v. Byrnes, C.C.Nev., 59 F. 29, 34; Pacific Postal Telegraph-Cable Co. v. Oregon & C. R. Co., C.C.Or., 163 F. 967, 971; Oregon Short Line R. Co. v. Postal Tel. Cable Co., 9 Cir., 111 F. 842, 846, 847; Louisville & N. R. Co. v. Western Union Tel. Co., 6 Cir., 249 F. 385, 391.

[5] See, also, Salt Lake City v. Salt Lake Water, etc., Co., 24 Utah 249, 67 P. 672, 677, 61 L.R.A. 648; Boston Water Power Co. v. Boston, etc., Co., 23 Pick., Mass., 360.